JANET M. HEROLD, Regional Solicitor
IAN H. ELIASOPH, Counsel for ERISA
CA State Bar No. 227557
GRACE A. KIM, Senior Trial Attorney
CA State Bar No. 247456
Office of the Solicitor
United States Department of Labor
350 S. Figueroa St., Suite 370
Los Angeles, California 90071-1202
Telephone: (213) 894-3950
Facsimile:  (213) 894-2064
kim.grace@dol.gov

Attorneys for Plaintiff, Secretary,
United States Department of Labor

**FILED**
CLERK, U.S. DISTRICT COURT

2/1/19

CENTRAL DISTRICT OF CALIFORNIA
BY: CS _____ DEPUTY

No Fee

## UNITED STATES DISTRICT COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| R. ALEXANDER ACOSTA,<br>    Secretary of Labor,<br>        United States Department of Labor,<br><br>        Plaintiff,<br><br>                 v.<br><br>RIVERSTONE CAPITAL LLC, a<br>California limited liability corporation;<br>NEXGEN INSURANCE SERVICES<br>INCORPORATED, a California<br>corporation; NGI BROKERAGE<br>SERVICES, INC., a California<br>corporation; JAMES C. KELLY, an<br>individual; TRAVIS O. BUGLI, an<br>individual; ROBERT CLARKE, an<br>individual; and ERIK MANQUEROS,<br>an individual.<br><br>        Defendants. | Case No.  CV19-778-CAS(MAAx)<br><br>COMPLAINT FOR VIOLATIONS OF<br>ERISA<br><br><br>**FILED WITH APPLICATION TO<br>BE FILED UNDER SEAL** |

R. ALEXANDER ACOSTA, Secretary of the United States Department of Labor ("the Secretary"), alleges:

## INTRODUCTION

1.     The Secretary is charged with enforcing the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq.  In this capacity, the Secretary brings this action to remedy breaches of DEFENDANTS' ERISA fiduciary duties committed in the course of their management of a multiple employer welfare arrangement ("MEWA"). DEFENDANTS have discretionary authority over approximately 112 separate self-funded ERISA-covered plans (Participating Plans) that cover approximately 16,303 participants, as well as approximately an additional 7 non-ERISA plans that cover approximately 2,384 people, as of November 2018.  Contrary to DEFENDANTS' misleading statements that they merely provided administrative services to the separate Participating Plans, in actuality DEFENDANTS administer the Participating Plans as a single self-funded MEWA. Funds for the Participating Plans are commingled and used to pay for the claims of other Participating Plans. DEFENDANTS direct Participating Plans to pay "premiums" directly into their corporate account. There, the premiums are commingled with the assets of all other Participating Plans and are not held in trust. Once the premium is collected, DEFENDANTS exercise plenary fiduciary control over the operation of the MEWA's ERISA plan assets. In doing so, they have engaged in flagrant violations

of ERISA that have caused significant harm that is likely to result in even greater widespread public harm absent prompt judicial actions.

2.     As set forth in detail below, in a bid to grow quickly, DEFENDANTS intentionally set premiums at rates below the market for fully insured plans that provided similar coverage. The rates that were set by DEFENDANTS were not approved by an actuary and were not actuarially sound. DEFENDANTS applied the same or similar premium rates to Participating Plans without regard to relevant factors such as the size of the participating employer and its risk profile. DEFENDANTS also sometimes agreed to lock in low premium rates for multiple years for Participating Plans.  As such, DEFENDANTS operated the Plan in a manner likely to result in having insufficient funds to pay claims.

3.     This risk of underfunding was compounded because in addition to offering low rates without regard to risk, DEFENDANTS charged exorbitant fees. Rather than holding the plan assets it collected from Participating Plans in trust as required by ERISA, the DEFENDANTS had all premiums remitted to their corporate bank account and never put any of the collected premiums in a trust. Once in the corporate coffers, the DEFENDANTS engaged in self-dealing by skimming 20% of the collected premiums for a "management fee" that was not disclosed nor contractually agreed upon by the employers participating in the Plan until recently.  Coupled with additional fees paid to brokers and other entities,

between 40-45% of all premiums collected from employers are used to pay fees, leaving only 55-60% to pay employee medical claims.

4.     Given the low premiums and high fees, the MEWA has fallen seriously behind in paying claims. Over recent months, the gap between the amount of unpaid claims and the amount the MEWA has on hand to pay claims has become urgent.  As of December 27, 2018, the MEWA had accumulated approximately $24 million in processed but unpaid claims despite the fact that the MEWA has very low reserves and only collects about $4-6 million in premiums per month. Relying on misrepresentations by DEFENDANTS, over a hundred unsuspecting employers have joined the MEWA to provide affordable medical benefits for their employees, only to have their employees be saddled with thousands of dollars in unpaid medical claims – with some facing escalating collections actions and others threatened with not being able to obtain life-saving medical treatment.

5.     ERISA is designed to protect against the harm DEFENDANTS have caused.  ERISA is designed to ensure "the soundness and stability of plans with respect to adequate funds to pay promised benefits."  ERISA § 2(a), 29 U.S.C. § 1001(a).  To protect plan assets, ERISA requires that such assets be held in trust by one or more trustee and that those who manage the assets of a plan to act solely, exclusively, and prudently in the interests of plan participants.  ERISA §§ 403(a), 404(a)(1)(A) and (B), 29 U.S.C. §§ 1103(a), 1104(a)(1)(A) and (B).

6.     ERISA prohibits fiduciaries from using plan assets for their own benefit, ERISA § 406(b), 29 U.S.C. § 1106(b), or in transactions with or for the benefit of "parties in interest," as defined in ERISA § 3(14); 29 U.S.C. § 1002(14), ERISA § 406(a), 29 U.S.C. § 1106(a), unless those transactions meet the strict requirements of statutory, class, or individual exemptions.  ERISA § 408, 29 U.S.C. § 1108.

7.     When ERISA's strict fiduciary standards are not met, the Secretary has the authority to seek relief under ERISA §§ 409 and 502(a)(2) and (5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), to restore plan losses, to recover unjust profits, and to obtain other remedial and equitable relief.  The Secretary may also seek to enjoin a breaching fiduciary from acting as a fiduciary or service provider to employee benefit plans in the future.

## BACKGROUND

8.     DEFENDANTS RIVERSTONE CAPITAL LLC, NEXGEN INSURANCE SERVICES INCORPORATED, and NGI BROKERAGE SERVICES, INC. (collectively and individually, the "RIVERSTONE DEFENDANTS"), JAMES C. KELLY (KELLY), TRAVIS O. BUGLI (BUGLI), ROBERT CLARKE (CLARKE) and ERIK MANQUEROS (MANQUEROS) operate a MEWA to provide health and welfare benefits for employer-sponsored ERISA-covered employee benefit plans.  As set forth more fully below, the

DEFENDANTS are fiduciaries with control over the plan assets and management of at least 112 ERISA-covered employee benefit plans participating in the MEWA ("Participating Plans").

9.      Premiums received from the Participating Plans are pooled together as part of the MEWA for purposes of paying participant and beneficiary claims.

10.      As a result of the DEFENDANTS' fiduciary breaches, alleged more fully below, the MEWA has insufficient assets to pay the promised benefits.

11.      In addition, the assets of the Participating Plans are used to pay excessive fees and expenses to the DEFENDANTS and to the other service providers retained to provide services to the Participating Plans through the MEWA.  Due to the considerable amount of undisclosed fees removed from the premiums paid by the Participating Plans, the remaining premiums are insufficient to cover the claims costs, resulting in approximately $24 million in unpaid, processed claims, as of December 27, 2018.

12.      Even though the DEFENDANTS owe a duty of prudence and loyalty to all of the Participating Plans' participants and beneficiaries, they have breached their fiduciary duties and engaged in prohibited transactions causing a loss of ERISA-covered plan assets, resulting in millions in unpaid medical claims. Nevertheless, the DEFENDANTS continue to pay themselves exorbitant fees and enroll new, unsuspecting employers in the MEWA.  Meanwhile, current participants and beneficiaries are receiving collections notices and forgoing life-

saving treatments.  Based on the ever growing backlog of unpaid claims, and the continual payment of excessive fees, the MEWA will not be able to pay all outstanding and future claims and is on the verge of collapse.

13.    DEFENDANTS have also breached their duty of prudence and loyalty by making misrepresentations to the participants of the plan and to the public regarding the Plan's design and its financial condition.

14.    The Secretary now brings this suit for relief.   The Secretary seeks to enjoin DEFENDANTS from serving as fiduciaries and service providers of the Participating Plans, and seeks the immediate appointment of an independent fiduciary to take control of the MEWA, the Participating Plans, and their assets.  In addition to the foregoing, this suit also seeks a final judgment to undo the prohibited transactions, to recover any residual losses to the Participating Plans, to permanently bar all DEFENDANTS from acting as an ERISA fiduciary or service provider in the future, and for other remedial and equitable relief.

## JURISDICTION AND VENUE

15.    This action arises under ERISA and is brought by the Secretary to obtain relief under ERISA §§ 409 and 502(a)(2) and (5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), to redress violations and enforce the provisions of Title I of ERISA.

16.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  The subject of the Secretary's Complaint is a MEWA that retains discretionary authority and control over the assets of employer-sponsored ERISA-covered employee benefit plans (*i.e.*, the Participating Plans) for the purpose of providing medical and other health and welfare benefits to employees and eligible employee dependents.

17.     Venue is appropriate in the Central District of California, Western Division, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), which provides for jurisdiction in any district "where a defendant resides or may be found."  The RIVERSTONE DEFENDANTS maintain an office and Defendants CLARKE and MANQUEROS reside in Los Angeles County, within the Western Division of this judicial district. In addition, the RIVERSTONE DEFENDANTS maintain another office within the judicial district and Defendant KELLY resides within this judicial district.  In addition, several of the alleged breaches took place within this judicial district.

## PARTIES

18.     The Secretary is vested with the authority to enforce the provisions of Title I of ERISA by, among other means, the filing and prosecution of civil claims against fiduciaries and other parties who violate ERISA.  ERISA § 502(a)(2) & (5), 29 U.S.C. § 1132(a)(2) & (5).

19.     Defendant RIVERSTONE CAPITAL, LLC is a California limited

liability company that was registered on January 28, 2014. NEXGEN

INSURANCE SERVICES INCORPORATED is a California corporation

registered on January 6, 2016. NGI BROKERAGE SERVICES, INC. is a

California corporation registered on January 5, 2016. All three of the

RIVERSTONE DEFENDANTS effectively operate as one entity, often under the

name Riverstone. Each of these entities shares the same ownership, the same

officers, and are headquartered in the same physical address. RIVERSTONE

DEFENDANTS also sometimes do business under the name Riverstone Capital

Insurance Services, LLC.

20.     The RIVERSTONE DEFENDANTS operate a MEWA that provides

benefits and holds assets for at least 112 ERISA-covered Participating Plans.  For

the remainder of this Complaint, the MEWA is referred to as the "RIVERSTONE

MEWA."  Each Participating Plan was established or maintained by an employer

for the purpose of providing medical and other health and welfare benefits

pursuant to ERISA § 3(2), 29 U.S.C. § 1002(2), and is thus an employee benefit

plan pursuant to ERISA § 3(3), 29 U.S.C. § 1002(3).  As an entity with authority

and control over ERISA-covered plan assets, the RIVERSTONE MEWA is subject

to the provisions of Title I of ERISA.  Because each Participating Plan is covered

by ERISA pursuant to section 4(a), 29 U.S.C. § 1003(a), the Participating Plan's

assets controlled by the RIVERSTONE MEWA are also subject to coverage of ERISA pursuant to section 4(a), 29 U.S.C. § 1003(a).

21.    The RIVERSTONE DEFENDANTS exercise authority and control over the assets of the Participating Plans covered by the RIVERSTONE MEWA. Specifically, the RIVERSTONE DEFENDANTS exercise discretionary control over all Plan assets.  Bank accounts are held in RIVERSTONE DEFENDANT's name and only employees of the RIVERSTONE DEFENDANTS have signatory authority over those accounts. Additionally, the RIVERSTONE DEFENDANTS exercise discretionary authority and control over the management and administration of the Participating Plans covered by RIVERSTONE MEWA. Thus, RIVERSTONE DEFENDANTS are fiduciaries of the Participating Plans pursuant to ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii), and parties in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A).

22.    DEFENDANT BUGLI is the Chief Operating Officer and Founding Partner of the RIVERSTONE DEFENDANTS. He has a 47.5% owner stake in the RIVERSTONE DEFENDANTS and is on the Board of Directors. He manages the everyday corporate operations and oversees accounting, sales, customer service, billing, and claims management.  DEFENDANT BUGLI oversees the third party administrators (TPAs) and has discretionary authority with respect to the payment of claims payments. As such, DEFENDANT BUGLI is a fiduciary pursuant to

ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii), and a party in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A).

23. DEFENDANT KELLY is a Founding Partner, 47.5% owner, President, and Chief Executive Officer (CEO) of the RIVERSTONE DEFENDANTS. He manages the day-to-day operations of the RIVERSTONE DEFENDANTS related to recruiting and managing personnel and medical provider costs, and he serves on the Board of Directors for the RIVERSTONE DEFENDANTS. As such, DEFENDANT KELLY is a fiduciary pursuant to ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii), and a party in interest pursuant to ERISA § 3(14)(A), (B) & (H), 29 U.S.C. § 1002(14)(A), (B) & (H).

24. DEFENDANT CLARKE is a 5% owner, President of the RIVERSTONE DEFENDANTS' Brokerage Services Division, and Partner who works with brokers to market the RIVERSTONE DEFENDANTS's services and with NG/RC's team of territorial managers who develop relationships with brokers. Clarke signs broker agreements on behalf of the RIVERSTONE DEFENDANTS and has sent information to brokers outlining DEFENDANT RIVERSTONE's role as plan administrator to the Participating Plans. As such, DEFENDANT CLARKE is a fiduciary pursuant to ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii), and a party in interest pursuant to ERISA § 3(14)(A), (B) & (H), 29 U.S.C. § 1002(14)(A), (B) & (H).

25.     DEFENDANT MANQUEROS is the RIVERSTONE DEFENDANTS' Executive Director and is responsible for managing its customer service division.  MANQUEROS made decisions with DEFENDANT BUGLI as a plan administrator, and provided direction and approval on matters relating to claims approval. As such, DEFENDANT MANQUEROS is a fiduciary pursuant to ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii), and a party in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A).

## GENERAL ALLEGATIONS

A. *The RIVERSTONE MEWA provides benefits to ERISA-Covered Plans.*

26.     The RIVERSTONE MEWA operates as a non-plan, ERISA-covered MEWA.  Participating employers are headquartered in approximately 13 states across the Country and come from a wide range of industries.  About 96 of the 112 ERISA-covered Participating Plans (85%) are for employers based in California. There is no evidence of common control among the participating employers, nor any cohesive bond.  Participating employers are heterogeneous and unrelated, with the only common purpose being a shared desire for employee medical coverage.

27.     Although the RIVERSTONE MEWA itself is not an ERISA-covered plan, employers sponsor Participating Plans that comprise the RIVERSTONE MEWA. With the exception of approximately seven non-ERISA covered plans, each of the other Participating Plans is covered by ERISA, which imposes fiduciary responsibilities on the DEFENDANTS.

28.     The Participating Plans obtain medical and other health and welfare benefits, including dental, vision, and prescription drug benefits, for their employees through their participation in the RIVERSTONE MEWA.  The RIVERSTONE MEWA offers different coverage and deductible options.

29.     The Participating Plans were created with the intent to provide benefits, and they have an identifiable class of beneficiaries, a source of financing, and procedures for obtaining the benefits.  When participating employers transfer employee and employer contributions to the RIVERSTONE MEWA on behalf of the Participating Plans, it is the employers' intent that these contributions are to be used to pay for claims and necessary administrative expenses.

B. *The MEWA used a common process to enroll ERISA-covered plans.*

30.     DEFENDANTS hired brokers to market the coverage, third party administrators to process claims, and other service providers, such as out-of-network pricing firms.  Each of these service providers has a contract directly with the RIVERSTONE DEFENDANTS, and the RIVERSTONE DEFENDANTS pay them for their services.

31.     Independent brokers marketed the coverage, and once a new employer agreed to sign on for coverage through the RIVERSTONE MEWA, the broker worked with the third party administrator to help the employer to apply for coverage with RIVERSTONE MEWA.  The employer completed a two-page employer application requiring information such as types of coverage selected, the

number of employees, and the states where employees are located. Some employers were also required to complete a two-page health status questionnaire, and others were required to submit historical claims experience data.

32. Once approved to participate in RIVERSTONE MEWA's coverage, RIVERSTONE MEWA required employer clients to sign an Administrative Services Agreement (ASA) with the third party administrator. RIVERSTONE had master agreements with two third party administrators: Hawaii Mainland Administrators (HMA) and S&S Healthcare, Ltd (S&S), so the employer clients signed agreements with either HMA or S&S. The ASAs between the TPAs and the employer clients were generally the same in substance.

33. Starting in early 2018, some employer clients also signed up for stop loss coverage by completing a two-page application presented to them by the broker or third party administrator. The stop loss policy application was identical across employer groups because RIVERSTONE had a broker arrangement with the stop loss carrier, Berkley Accident and Life Insurance Company, to offer RIVERSTONE's employer groups similar coverage.

34. Employers were sent largely identical plan documents by HMA or S&S. The plan documents did not establish a trust. RIVERSTONE did not obtained signed plan documents by many of the participating employers.

C. *RIVERSTONE MEWA controlled and commingled Plan Assets and operated the Participating Plans as a single MEWA.*

35.     RIVERSTONE collected "premium" contributions into a single corporate account (number ending 5003) at Bank of America.  Participating employers paid RIVERSTONE directly via check or electronic transfer into this account, over which RIVERSTONE also had sole control.

36.     RIVERSTONE transferred money from account 5003 to at least two other Bank of America accounts: account ending 4787 used for RIVERSTONE's operational expenses (like payroll), and account ending 5016 used for paying claims and service providers (like broker commissions and stop loss premiums). Multiple claims for different employers were paid as lump sum transactions out of account 5016 to the TPAs.

37.     While third party administrators received and processed claims and appeals, RIVERSTONE alone controlled claim payment by deciding which claims were paid and when.  The third party administrators bundled claims into batches based on process date, mixing together claims from multiple employers, then emailed RIVERSTONE to request funding for the entire batch as a whole. RIVERSTONE responded by either not paying, partially paying, or immediately transferring to the TPA the exact amount of money needed to fund the batch.

38.     Prior to July 2018, RIVERSTONE used money from Bank of America account 5016 to pay claims.  The claim payments appeared on statements

as payments to Zelis Payments (dba PayPlus), a company that HMA had hired to help process payments to providers. Money sent to Zelis was disbursed to providers.

39.    In July 2018, RIVERSTONE instructed each TPA to set up a separate bank account for each employer group. HMA and S&S opened up such accounts at Arizona Bank and Trust and US Bancorp in the TPA's name on behalf of the relevant employers. The TPAs used these employer accounts as pass-through accounts that generally did not hold reserves from month to month. The employer accounts generally received only the funds needed to pay that employer's approved claims for a given batch that RIVERSTONE had approved and for which RIVERSTONE had sent funds to the TPA's operating account for that month. RIVERSTONE generally kept the remainder of all premiums received in the Bank of America 5003, 5016, or 4787 accounts.

40.    Although plan documents and other material indicated that each Participating Plan maintained a discrete, self-funded plan that existed on its own and had no relationship to other Participating Plans, in operation, DEFENDANTS caused the Participating Plans to be commingled and operated together.

41.    RIVERSTONE obtained no audited financial statements.

42.    Although RIVERSTONE maintains separate profit and loss (P&L) statements for each Participating Plan, these statements and information from RIVERSTONE's officers confirm that assets are commingled and premiums from

one Participating Plan may be used to pay the claims of another Participating Plan. Many Participating Plans had unfavorable claims experiences that exceeded the total amount of premium equivalents they paid in a given year.  For example, APR Consulting had a cumulative $609,227 shortfall from June 2016 through October 2018, and Regency Lighting had a shortfall of $645,842 from May 2017 through March 2018.  Of the P&L statements that have been produced to the Secretary, 15 out of 45 employers in 2016 show a negative balance; 35 out of 79 employers in 2017 show a negative balance; and 34 out of 81 employers show a negative balance for the first 3 quarters of 2018.

43.    Although contracts with participating employers first were introduced on a widespread basis around the beginning of 2018 and other documents indicate that the participating employers were responsible to cover any underfunding, in practice, DEFENDANTS did not operate the MEWA in this manner. As of October 2018, and possibly up to the present, the RIVERSTONE MEWA never charged or recovered from an underfunded Participating Plan the differential between the premium equivalents and the outstanding claims. In practice, claims were simply funded out of the common corporate account the RIVERSTONE DEFENDANTS maintained for all Participating Plans.

D. *The RIVERSTONE MEWA is operating in violation of California state law.*

44.    DOL shares regulatory jurisdiction with state departments of insurance, which regulate insurers, MEWAs, brokers, and third party claims

processors as licensees. About 96 out of 112 (or 85%) employers participating in the MEWA (as of November 2018) are located in California.

45.    California requires that a MEWA obtain a license before they can operate in the state. The DEFENDANTS have not secured a license for the MEWA to operate in any state.

E. *Confusing and inconsistent statements caused some employers to believe that the Plan operated as an insurer.*

46.    The RIVERSTONE DEFENDANTS made a number of statements that suggested to employers and brokers that the RIVERSTONE MEWA operated like a fully insured plan in that the Participating Plan was protected from risk in the event that claims exceeded premium contributions.

47.    For example, the RIVERSTONE DEFENDANTS described on their website their product as offering a "private exchange" offering "comprehensive health insurance coverage."

48.    Similarly, in a RIVERSTONE DEFENDANTS FAQ provided by DEFENDANT CLARKE to Crystal & Company, a major broker for the MEWA, on May 1, 2017, the RIVERSTONE DEFENDANTS states that with respect to exposures and risks to the client employer, "Employer pays billed amount on your monthly invoice and [RIVERSTONE DEFENDANTS] pays the claims, fixed costs, TPA vendors, etc. We keep our own reserves to indemnify a group if it takes a loss during the calendar year… [RIVERSTONE DEFENDANTS] keeps a

pooling point on each group of an average of 150k (this amount fluctuates depending on the size and premium equivalent intake of the group annualized). If a group exceeds that amount during the calendar year, [RIVERSTONE DEFENDANTS] indemnifies the group using our reserves."

49. In template Form 5500 filings that the Participating Plans filed with EBSA, several employers listed RIVERSTONE as their plan's insurer.

## COUNT ONE

The RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and
CLARKE Failed to Appoint a Named Trustee and
Keep Plan Assets in Trust within the United States

50. Paragraphs 1-49 above are incorporated by reference.

51. The plan documents for the Participating Plans do not identify a trustee for the RIVERSTONE MEWA documents or the Participating Plans.

52. Despite holding ERISA plan assets, the RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE have not specifically appointed a trustee for the RIVERSTONE MEWA or the Participating Plans.

53. As outlined above, the RIVERSTONE MEWA and Participating Plans' assets are held in accounts in the RIVERSTONE DEFENDANTS' name. Although the TPAs now have set up accounts by employer, these accounts operate as pass-through accounts that are not trust accounts and are only funded once the

RIVERSTONE DEFENDANTS have approved the payment of specific outstanding claims.

54.     The RIVERSTONE DEFENDANTS are not licensed insurance issuers qualified to do business in the states in which they operate.

55.     In October 2018, RIVERSTONE DEFENDANTS transferred $200,000 from one of the MEWA's operating accounts to an account at Scotia Bank in the Cayman Islands.

56.     The RIVERSONE DEFENDANTS operated at the direction of their Directors DEFENDANTS KELLY, BUGLI, and CLARKE with respect to Paragraphs 51-55.

57.     By the actions and failures to act as described above, the RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE:

       A.     failed to hold all assets of an employee benefit plan in trust by one or more trustees named in the trust instrument or plan instrument or appointed by a person who is a named fiduciary, in violation of ERISA § 403(a), 29 U.S.C. § 1103(a); and

       B.     maintained the indicia of ownership of plan assets outside the jurisdiction of the district courts of the United States, in violation of ERISA § 404(b), 29 U.S.C. § 1104(b).

58.     As a result of the foregoing breaches of duty, the RIVERSTONE

DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE caused

losses to the ERISA-covered employee benefit plans participating in the

RIVERSTONE MEWA, for which the Participating Plans are entitled to equitable

relief.  ERISA § 409, 29 U.S.C. § 1109.

59.     Pursuant to ERISA § 405(a)(1) through (3), 29 U.S.C. § 1105(a)(1)

through (3), DEFENDANTS RIVERSTONE, and DEFENDANTS KELLY,

BUGLI, and CLARKE are liable for the breaches of its co-fiduciaries as described

above, because it knowingly participated in or concealed an act or omission of its

co-fiduciaries, knowing that such act or omission was a breach; it enabled its co-

fiduciaries to commit a breach by breaching their own fiduciary duties under

ERISA § 404(a)(1), 29 U.S.C.§ 1104(a)(1); and it had knowledge of a fiduciary

breach by its co-fiduciaries and did not make reasonable efforts under the

circumstances to remedy it.

## COUNT TWO

The RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI,

CLARKE

Failed to Set Adequate Premium Rates

60.     Paragraphs 1-59 above are incorporated by reference.

61.     Prior to September 2018, and possibly up to the present,

RIVERSTONE DEFENDANTS did not have any actuarial reports to support the

initial setting of its premiums or re-rating of any groups.  DEFENDANT BUGLI,

acting on behalf of RIVERSTONE DEFENDANTS, initially set the monthly premium equivalents charged to participating employers below the monthly premium rates charged by fully-insured issuers in the group insurance market. DEFENDANT BUGLI is not an actuary.

62.     The rates were set to undercut the cost of Kaiser HMO, one of the lowest-cost insurance coverage options on the market at the time, in order to compete and attract new employer groups.

63.     In October 2017, RIVERSTONE DEFENDANTS retained Milliman as a consultant to provide actuarial analysis, but by January 2018 Milliman was unable to complete its actuarial analysis due to insufficient data and inputs provided by RIVERSTONE DEFENDANTS.  As of September 2018, Milliman was still unable to complete a final report or opine on whether the premium equivalent rates set by RIVERSTONE DEFENDANTS were actuarily sound.

64.     RIVERSTONE DEFENDANTS misrepresented to brokers who marketed the coverage that Milliman had conducted a study that supported the premium rates.  A June 21, 2018 PowerPoint presentation by the RIVERSTONE DEFENDANTS inaccurately states: "We recently contracted with Milliman & Robertson, a leader in actuarial consulting since 1947, to perform an Actuarial Study.  The results of the Study supported our offered rates and the viability of our product."

65.     At least as of September 2018, RIVERSTONE charged the same premium to different groups, including large and small groups, that selected the same type of coverage, such as PPO coverage.  For example, RIVERSTONE charged multiple groups $360 per month for employee-only coverage under the PPO option over multiple years.

66.     Despite not having actuarial analysis to support the setting of the initial premiums for new groups or any re-rating process at renewal, RIVERSTONE DEFENDANTS guaranteed participating employers a locked-in monthly premium equivalent rate for anywhere between one to several years. The RIVERSTONE DEFENDANTS also agreed to cap rate increases.

67.     RIVERSTONE DEFENDANTS guaranteed a set premium rate to employer clients for up to several years. For example, in letters to at least two client employers in March 2018, RIVERSTONE guaranteed rates for a period of two years and provided that "[i]f the premiums and premium equivalents collected (plan assets) is exhausted and monies are still owed for claims and administrative expenses then Riverstone Capital, LLC will assume full responsibility to satisfy those expenses."

68.     In September 2018, RIVERSTONE DEFENDANTS hired an in-house actuary.  As of October 2018, this actuary had reviewed 24 employer groups out of over 100 groups and recommended that RIVERSTONE DEFENDANTS

increase its premium rates.  He conducted his actuarial analysis by aggregating employers into three groups based on size.

69.     The RIVERSTONE DEFENDANTS did not secure a certificate of compliance from the State of California as required by California Insurance Code § 742.23 and did not comply with the State of California's requirement to file an annual report supported by financial statements audited by a certified public accountant and an actuarial opinion rendered by a qualified actuary as required by California Insurance Code § 742.31.

70.     As a result of lack of funding, the RIVERSTONE MEWA has fallen behind on paying claims. As of December 27, 2018, RIVERSTONE DEFENDANTS had accumulated approximately $24 million in adjudicated but unpaid claims.  Of this amount, $7.3 was attributable to HMA and $16.9 was attributable to S&S.  Based on claims detail from HMA, it appears that the amount of unpaid claims was steadily increasing, as the balance of unpaid claims processed by HMA increased from $5.4 million on October 8, 2018 to $7.3 million on December 27, 2018.

71.     RIVERSTONE DEFENDANTS did not have any separate accounts earmarked as reserves, nor did RIVERSTONE DEFENDANTS budget for reserves.  RIVERSTONE DEFENDANTS represented to clients and brokers in the client service agreements and marketing materials that its 20% management fee would act as a reserve such that it would be at risk for paying claims if claims

experience exceeded the premium equivalent amounts. RIVERSTONE

DEFENDANTS's total assets as of December 31, 2018 were around $8 million,

comprised of around $7 million in accounts receivable, which were primarily the

premiums owed by Participating Plans. Some of these receivables were pledged to

third party lenders in exchange for cash advances that RIVERSTONE

DEFENDANTS used to pay claims and operating expenses. RIVERSTONE

DEFENDANTS were receiving around $5-6 million in employer contributions per

month in late 2018.

72.     Starting in at least April 2018, RIVERSTONE DEFENDANTS began

taking out high-interest working capital loans. As of January 25, 2019, the total

principal received by RIVERSTONE DEFENDANTS through seven such loans

since April 2018 was $3,747,750. The payment terms begin April 30, 2018 and

continue as far as April 18, 2019. The monthly payments on these outstanding

loans total $577,501. The total payoff amount as of December 31, 2018 was

$2,317,027.

73.     The RIVERSONE DEFENDANTS operated at the direction of their

Directors DEFENDANTS KELLY, BUGLI, and CLARKE with respect to

Paragraphs 61-73.

74.     By the actions and failures to act as described in this and other Counts

in this Complaint, RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY,

BUGLI, and CLARKE:

A.     failed to act solely in the interest of the participants and beneficiaries of the Participating Plans and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

B.     failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

75.    As a result of the foregoing breaches of duty, RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE caused losses to the ERISA-covered employee benefit plans participating in the RIVERSTONE MEWA, for which the Participating Plans are entitled to equitable relief.  ERISA § 409, 29 U.S.C. § 1109.

76.    Pursuant to ERISA § 405(a)(1) through (3), 29 U.S.C. § 1105(a)(1) through (3), Defendants RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE, are liable for the breaches of their co-fiduciaries as described above, because they knowingly participated in or concealed an act or omission of their co-fiduciaries, knowing that such act or omission was a breach; they enabled their co-fiduciaries to commit a breach by breaching their own

fiduciary duties under ERISA § 404(a)(1), 29 U.S.C.§ 1104(a)(1); and they had knowledge of a fiduciary breach by their co-fiduciaries and did not make reasonable efforts under the circumstances to remedy it.

COUNT THREE

The RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI,<br/>CLARKE and MANQUEROS

Failure to Timely Pay Claims, Inability to Pay Full Amount of Future Claims

Misrepresentations related to Funding

77.     Paragraphs 1 through 76 are incorporated by reference.

78.     As a result of lack of funding, the RIVERSTONE MEWA has fallen behind on paying claims. As of December 27, 2018, RIVERSTONE DEFENDANTS had accumulated approximately $24 million in adjudicated but unpaid claims.  Of this amount, $7.3 was attributable to HMA and $16.9 was attributable to S&S.  Based on claims detail from HMA, it appears that the amount of unpaid claims was steadily increasing, as the balance of unpaid claims processed by HMA increased from $5.4 million on October 8, 2018 to $7.3 million on December 27, 2018.

79.     RIVERSTONE DEFENDANTS did not have any separate accounts earmarked as reserves, nor did RIVERSTONE DEFENDANTS budget for reserves.  RIVERSTONE DEFENDANTS represented to clients and brokers in the client service agreements and marketing materials that its 20% management fee would act as a reserve such that it would be at risk for paying claims if claims experience exceeded the premium equivalent amounts. RIVERSTONE

DEFENDANTS's total assets as of December 31, 2018 were around $8 million, comprised of around $7 million in accounts receivable, which were primarily the premiums owed by Participating Plans. Some of these receivables were pledged to third party lenders in exchange for cash advances that RIVERSTONE DEFENDANTS used to pay claims and operating expenses. RIVERSTONE DEFENDANTS were receiving around $5-6 million in employer contributions per month in late 2018.

80. Starting in at least April 2018, RIVERSTONE DEFENDANTS began taking out high-interest working capital loans. As of January 25, 2019, the total principal received by RIVERSTONE DEFENDANTS through seven such loans since April 2018 was $3,747,750. The payment terms begin April 30, 2018 and continue as far as April 18, 2019. The monthly payments on these outstanding loans total $577,501. The total payoff amount as of December 31, 2018 was $2,317,027.

81. The process used to pay claims begins once HMA or S&S processes claims for approval and sends them in "batches" to RIVERSTONE DEFENDANTS to approve the release of funds. However, starting as early as January 2018, RIVERSTONE DEFENDANTS began picking and choosing specific batches of claims to pay immediately and delaying payments on others.

82. Because of underfunding, the RIVERSTONE DEFENDANTS have purposely delayed the payment of claims for several months or more after the

claims have already been approved by the TPAs because of cash flow issues. Specifically, RIVERSTONE DEFENDANTS cherry-picked claims and re-batched them for payment. RIVERSTONE DEFENDANTS would identify the most persistent complaining members or providers and the most urgent claims from unfunded batches, pull those claims out of the unfunded batches, and include them in a batch that was about to be paid.

83.    DEFENDANTS have deliberately attempted to have persons mislead regarding the cause of delays in payment.

84.    As a result of late or unpaid claims, numerous participants and beneficiaries have been harmed. A number of participants have asserted that they have had bills sent to collection as a result of lack of payment, negatively impacting their credit score. Other participants have stated that they could not get pre-authorization for covered benefits or their healthcare providers stopped treating them as a result of non-payment.

85.    By late 2018, RIVERSTONE DEFENDANTS began increasing the quoted premiums for some groups at renewal time, with potential rate increases of up to 200%. In January 2019, RIVERSTONE DEFENDANTS attempted to have clients sign new client agreements making clear that the employers were responsible for paying for funding shortfalls. These changes are likely to cause the unlicensed MEWA to collapse rapidly. With these significant rate increases, many employers are already beginning to pull out of the MEWA and seek health coverage elsewhere in the market, leaving even less money for paying claims for

the remaining groups.  Employers with higher-risk groups who cannot afford coverage elsewhere will be more likely to stay in the arrangement (adverse selection), and the gap between available assets and unpaid claims liability is likely to dramatically widen.

86.     At least one broker, representing almost half the participants in the Plan, has indicated that it will not recommend employers continue coverage under the RIVERSTONE MEWA and will pull them out of the plan.

87.     The RIVERSONE DEFENDANTS operated at the direction of their Directors DEFENDANTS KELLY, BUGLI, and CLARKE with respect to Paragraphs 78-86.

88.     By the actions and failures to act as described here and elsewhere in the Complaint, RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, CLARKE, and MANQUEROS:

A.     failed to act solely in the interest of the participants and beneficiaries of the Participating Plans and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

B.     failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims, in violation of ERISA §

404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

89.     As a result of the foregoing breaches of duty, RIVERSTONE

DEFENDANTS, and DEFENDANTS KELLY, BUGLI, CLARKE, and

MANQUEROS caused losses to the ERISA-covered employee benefit plans

participating in the RIVERSTONE MEWA, for which the Participating Plans are

entitled to equitable relief.  ERISA § 409, 29 U.S.C. § 1109.

90.     Pursuant to ERISA § 405(a)(1) through (3), 29 U.S.C. § 1105(a)(1)

through (3), Defendants RIVERSTONE DEFENDANTS, and DEFENDANTS

KELLY, BUGLI, CLARKE, and MANQUEROS are liable for the breaches of

their co-fiduciaries as described above, because they knowingly participated in or

concealed an act or omission of their co-fiduciaries, knowing that such act or

omission was a breach; they enabled their co-fiduciaries to commit a breach by

breaching their own fiduciary duties under ERISA § 404(a)(1), 29 U.S.C.§

1104(a)(1); and they had knowledge of a fiduciary breach by their co-fiduciaries

and did not make reasonable efforts under the circumstances to remedy it.

## COUNT FOUR

The RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and
CLARKE Defendants Pay Themselves and Others Unreasonable
Administrative Fees and Expenses from Plan Assets

91.     Paragraphs 1-90 above are incorporated by reference.

92.     All Defendants are fiduciaries and parties-in-interest to the
Participating Plans.

93.     DEFENDANTS continue to spend between 40 and 45 percent of the
premiums by Participating Plans on fees and expenses before paying claims.

94.     According to service provider agreements generally executed in 2018,
marketing materials, and interviews with RIVERSTONE officers, the breakdown
of fees and expenses was as follows: 20% RIVERSTONE DEFENDANTS
Management Fee; 10% Brokers' commissions (7% for brokers and 3% for general
agency); 10-15% Vendors: Stop loss, network fees, medical management, out-of-
network pricing, others.

95.     The 20% fee was excessive and did not represent reasonable
compensation for the services the RIVERSTONE DEFENDANTS provided.

96.     Prior to early 2018, the 20% Management Fee was not generally
contractually agreed upon with the employers of the Participating Plans. Rather,
the RIVERSTONE DEFENDANTS set their own compensation rate which they

paid to themselves out of Plan Assets. Some employers were presented with the

provider agreements disclosing the 20% Management Fee for the first time as late

as September 2018.

97.     The 20% Management Fee remained plan assets and a discretionary

payment even after it was disclosed and contractually agreed upon with the

employers of the Participating Plans. The RIVERSTONE DEFENDANTS

committed to placing the management fee "at risk" and it is only payable if the

Participating Plan does not prove to be underfunded. The fee was commingled with

Plan assets and was not definitively calculable when so commingled with the Plan.

98.     DEFENDANTS caused the plan assets to be used to pay non-plan

expenses, including but not limited to the following:

| | 2018 | 2017 | 2016 | totals |
|---|---|---|---|---|
| Porsche/Bentley – Car Lease | 19,154 | 0 | 0 | 19,154 |
| Commissions to fiduciaries | 4,302 | 38,469 | 132,617 | 175,388 |
| Partnership Distributions | 25,000 | 575,000 | 750,000 | 1,350,000 |
| Bonus + deferred compensation to fiduciaries | 0 | 36,050 | 50,000 | 86,050 |
| Totals | $48,456 | $649,519 | $932,617 | $1,630,592 |

99.     By the actions and failures to act as described above, DEFENDANTS:

A.     failed to act solely in the interest of the participants and

beneficiaries of the Participating Plans and for the exclusive purpose of

providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

B.     failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

C.     used the Participating Plans' assets in transactions which furnished goods, services, or facilities between the and Participating Plans and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C);

D.     used the Participating Plans' assets in transactions which they knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the RIVERSTONE MEWA, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); and

E.     dealt with assets of the Plans in their own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

F.     acted on behalf of a party whose interests were adverse to the interests of the Participating Plans or the interests of their participants

and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

G.    received consideration for their own personal account from a party dealing with the plan in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

100.    As a result of the foregoing breaches of duty, caused losses to the ERISA-covered employee benefit plans participating in the RIVERSTONE MEWA, for which the Participating Plans are entitled to equitable relief.  ERISA § 409, 29 U.S.C. § 1109.

<u>COUNT FIVE</u>

The RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE

Failed to Comply with ERISA reporting requirements.

101.    The RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE failed to cause the RIVERSTONE MEWA to file a Form M-1 annually as required under ERISA 101(g).

102.    On January 29, 2019, RIVERSTONE DEFENDANTS filed a Form M-1 for the first time.  It was for the 2018 plan year and was signed by DEFENDANT BUGLI.  The Form M-1 was woefully incomplete and included only the name, address, phone number, employer identification number of the MEWA, and contact information for the RIVERSTONE and DEFENDANT BUGLI.  The reminder of the form was blank, including all information about service providers, assets, actuaries, promoters, marketers, custodians, state licensure, financial information, and names of persons with control over assets.

PRAYER FOR RELIEF

WHEREFORE, the Secretary asks that this Court enter an Order:

103.    Preliminarily and permanently removing the RIVERSTONE
DEFENDANTS, and DEFENDANTS KELLY, BUGLI,CLARKE, and
MARQUEROS, and anyone acting on their behalf, including their officers, agents,
employees, assigns, subsidiaries, affiliates, service providers, accountants,
attorneys, and any other party acting in concert with them or at their direction, as
fiduciaries, service providers, trustees, and administrators of the Participating Plans
or the RIVERSTONE MEWA;

104.    Preliminarily and permanently enjoining the RIVERSTONE
DEFENDANTS, and DEFENDANTS KELLY, BUGLI, CLARKE, and
MARQUEROS, and anyone acting on their behalf, including their officers, agents,
employees, assigns, subsidiaries, affiliates, service providers, accountants,
attorneys, and any other party acting in concert with them or at their direction from
acting as a fiduciary, service provider, trustee, or administrator to the Participating
Plans or the RIVERSTONE MEWA.

105.    Issuing a preliminary injunction requiring DEFENDANTS to provide
immediate notice to all participants in a form approved by the Secretary that
informs participants that the MEWA is underfunded and that there is a significant

risk that medical expenses will not be reimbursed even if an expense is covered by the Participating Plan.

106.    Appointing Receivership Management, Inc. ("Independent Fiduciary") as the independent fiduciary, successor Trustee and Plan Administrator to the RIVERSTONE MEWA and Participating Plans, with full and exclusive fiduciary authority over their administration and management, and full and exclusive control over the RIVERSTONE MEWA and Participating Plans' assets, including, but not limited to:

  a.    Authority to exercise all fiduciary responsibilities relating to the RIVERSTONE MEWA and Participating Plans;

  b.    Authority to take exclusive control of all plan assets of the RIVERSTONE MEWA and the Participating Plans.

  c.    Authority given to trustees under the terms of the documents governing the RIVERSTONE MEWA and Participating Plans;

  d.    Authority to amend the documents governing the RIVERSTONE MEWA;

  e.    Exclusive authority to appoint, replace and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers as the Independent Fiduciary shall, in the Independent Fiduciary's sole discretion, determine are necessary to aid the Independent Fiduciary in the exercise of the Independent

Fiduciary's powers, duties, and responsibilities to the

RIVERSTONE MEWA and Participating Plans;

f.  Authority to conduct an accounting of all medical claims and

negotiate all medical claims;

g.  Authority to terminate the RIVERSTONE MEWA and

Participating Plans, if in the best interest of the RIVERSTONE

MEWA and Participating Plans and, in that event, to establish a

claims submission deadline and to adjudicate all claims filed by

such deadline and to deny claims not filed by the claims

submission deadline;

h.  Authority to adjudicate and pay or deny any and all claims

submitted to the RIVERSTONE MEWA and Participating Plans;

i.  Authority to pursue recovery of monies owed and due to the

RIVERSTONE MEWA and Participating Plans from any person

obligated to make such payments under the terms and conditions of

the RIVERSTONE MEWA and Participating Plans;

j.  Authority to identify and pursue recovery of RIVERSTONE

MEWA and Participating Plans' assets as well as any monies to

which the RIVERSTONE MEWA or and Participating Plans have

a right of recovery;

k.  Authority to identify and pursue claims on behalf of the
RIVERSTONE MEWA and Participating Plans;

l.  Except as provided herein, the authority to delegate to such
administrators, trustees, attorneys, employees, assigns, agents, and
service providers such fiduciary responsibilities as the Independent
Fiduciary shall determine appropriate.  The Independent Fiduciary
may not, however, delegate the authority to appoint, replace and
remove such administrators, trustees, attorneys, employees,
assigns, agents, and service providers or the responsibility to
monitor the activities of RIVERSTONE MEWA and Participating
Plans' trustees, attorneys, agents, and service providers; and

m.  Authority to pay itself reasonable and necessary fees from the
RIVERSTONE MEWA and Participating Plans' assets and pay the
reasonable and necessary fees of service providers.

107.   Requiring DEFENDANTS  to restore all losses they caused to the
Participating Plans;

108.   Requiring DEFENDANTS  to jointly and severally reimburse the fees
and expenses of the Independent Fiduciary to the RIVERSTONE MEWA and
Participating Plans;

109.   Requiring Defendants the RIVERSTONE DEFENDANTS, and
DEFENDANTS KELLY, BUGLI, and CLARKE, to disgorge to the

RIVERSTONE MEWA all profits and fees and other monies earned in connection with their violations;

110.   pursuant to the All Writs Act staying, enjoining and/or prohibiting any person or entity from claiming as against the assets of the Plans outside of the procedures and processes to be set forth by the independent fiduciary and for such protections to be maintained until closure of the liquidation process or until further order by this Court;

111.   Permanently enjoining RIVERSTONE DEFENDANTS, and DEFENDANTS KELLY, BUGLI, and CLARKE, or anyone acting on their behalf including their principals, officers, directors, owners, agents, assigns or subsidiaries, from ever acting as a fiduciary or service provider to any plan covered by Title I of ERISA and from marketing or enrolling any employers, professional employer organizations, or participants in any ERISA or non-ERISA covered health plan or any plan purporting to provide any type of medical benefits; and

112.   Granting such other relief as may be equitable, just, and proper.

JANET M. HEROLD
Regional Solicitor

Dated: February 1, 2019

/s/  Ian H. Eliasoph
IAN H. ELIASOPH
Counsel for ERISA

GRACE A. KIM
Senior Trial Attorney

**Attorneys for the Plaintiff**