FILED
CLERK, U.S. DISTRICT COURT

2/1/19

CENTRAL DISTRICT OF CALIFORNIA
BY: CS_____ DEPUTY

1
2   JANET M. HEROLD
    Regional Solicitor
3   IAN H. ELIASOPH
    Counsel for ERISA (CSBN #227557)
4   GRACE A. KIM
    Senior Trial Attorney (CSBN #247456)
5   Office of the Solicitor
    United States Department of Labor
6   350 South Figueroa Street, Suite 370
    Los Angeles, California 90071-1202
7   Telephone: (213) 894-3950
    Facsimile: (213) 894-2064
8   Email: kim.grace@dol.gov
9
10  Attorneys for Plaintiff, United States
11  Secretary of Labor

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15  **R. ALEXANDER ACOSTA**, Secretary of     )   Case No.: CV19-778-CAS(MAAx)
    Labor, United States Department of Labor,  )
16                                             )   **SECRETARY'S MEMORANDUM**
                    Plaintiff,                 )   **OF POINTS AND AUTHORITIES**
17                                             )   **IN SUPPORT OF APPLICATION**
             v.                                )   **FOR TEMPORARY**
18                                             )   **RESTRAINING ORDER AND**
    **RIVERSTONE CAPITAL LLC, a**              )   **ORDER FOR DEFENDANTS TO**
19  **California limited liability corporation;**)  **SHOW CAUSE WHY A**
    **NEXGEN INSURANCE SERVICES**              )   **PRELIMINARY INJUNCTION**
20  **INCORPORATED, a California**             )   **SHOULD NOT ISSUE**
    **corporation; NGI BROKERAGE**            )
21  **SERVICES, INC., a California**           )
    **corporation; JAMES C. KELLY, an**       )
22  **individual; TRAVIS O. BUGLI, an**        )
    **individual; ROBERT CLARKE, an**         )
23  **individual; ERIK MANQUEROS, an**        )   **FILED WITH APPLICATION**
    **individual.**                           )   **TO BE FILED UNDER SEAL**
24                                             )
25                  Defendants                 )
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION……………………………………………………………1

II.   FACTUAL BACKGROUND……………………………………………...3

III.  ARGUMENT………………………………………………………………7

**A.** Legal Framework…………………………………………………7

    1. The Court has Broad Authority under ERISA to Grant the Relief Sought……………………………………………………7

    2. Standard for Issuing a TRO…………………………………..8

**B.** The Secretary is Entitled to a TRO and Preliminary Injunction……..10

    1. There is More Than a Reasonable Likelihood that the Secretary Will Succeed on the Merits………………………………………10

        i.    The Participating Plans are Covered by ERISA…………….10

        ii.   All Premiums Paid to the MEWA are Plan Assets…………..12

        iii.  Defendants are ERISA Fiduciaries…………………….....…13

            a.  Riverstone……………………………………………..14

            b.  Travis Bugli……………………………………………14

            c.  James Kelly…………………………………………….15

            d.  Robert Clarke………………………………………….15

        iv.   Defendants are liable for any breaches by co-fiduciaries...…16

        v.    Defendants Breached their fiduciary duties…………………16

            a.  Violation of ERISA § 403: Failure to Hold Plan Assets in Trust and Have a Trustee…………………………………16

            b.  Violation of ERISA § 406(b): Self Dealing with Plan Assets and Setting own Compensation…………………………...17

            c.  Violation of ERISA § 404(a): Failure to Act Prudently And Solely in the Interest of Plan Participants and Beneficiaries Which Has Resulted in Millions of Unpaid Claims……………………………………………...20

    2. Absent immediate injunctive relief, the Secretary, the public and Defendants' employees will continue to suffer irreparable harm…23

SECRETARY'S MEMORANDUM OF POINTS AND            Case No.: 2:16-cv-4547-FMO-AGRx
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

i

3.   <u>The balance of equities tilts sharply in the Secretary's favor and
     An injunction is in the public interest</u>……………………………..23

IV.   CONCLUSION…………………………………………………………..24

SECRETARY'S MEMORANDUM OF POINTS AND          Case No.: 2:16-cv-4547-FMO-AGRx
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

ii

# TABLE OF AUTHORITIES

Cases

*Acosta v. AEU Benefits, LLC, et al.*,
  Case No. 17-cv-7931-JHL-SMF (N.D. Ill. Apr. 18, 2018)……………………………..8

*Acosta v. Pac. Enterprises*,
  950 F.2d 611 (9th Cir. 1991) ................................................................. 12, 16

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...................................................................... 9

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
  643 F.3d 1165 (9th Cir. 2010) ................................................................ 9, 23

*Ariz. State Carpenters Pension Trust Fund v. Citibank*,
  125 F.3d 715 (9th Cir. 1997) ...................................................................... 14

*Barboza v. California Ass'n of Professional Firefighters*,
  799 F.3d 1257 (9th Cir. 2015) .................................................................... 16

*Beck v. Levering*,
  947 F.2d 639 (2d Cir. 1991) ....................................................................... 24

*Becker v. Eastman Kodak Co.*,
  120 F.3d 5 (2d Cir. 1997) ........................................................................... 22

*Central Illinois Carpenters Health & Welfare Trust Fund v. S&S Fashion Floors, Inc.*,
  516 F.Supp.2d 931 (C.D. Ill. 2007) ............................................................ 13

*Concha v. London*,
  62 F.3d 1493 (9th Cir. 1995) ...................................................................... 14

*Credit Managers Ass'n v. Kennesaw Life & Acc. Ins.*,
  809 F.2d 617 (9th Cir. 1987) ................................................................ 11, 15

*Cutaiar v. Marshall*,
  590 F.2d 523 (3d Cir. 1979) ....................................................................... 18

*Cutler v. The 65 Security Plan,*
  831 F. Supp. 1008 (E.D.N.Y. 1993) ............................................................. 8

*Diak v. Dwyer, Costello & Knox,*
  33 F.3d 809 (7th Cir. 1994) ...................................................................... 11

*Donovan v. Bierwirth,*
  680 F.2d 263 (2d Cir. 1982) ..................................................................... 13

*Donovan v. Mazzola,*
  716 F.2d 1226 (9th Cir. 1983) ................................................... 7, 22, 24, 25

*Donovan v. Mercer,*
  747 F.2d 304 (5th Cir. 1984) .......................................................... 14, 18, 19

*F.T.C. v. H. N. Singer, Inc.,*
  668 F.2d 1107 (9th Cir. 1982) .................................................................. 21

*Griggs v. E.I. DuPont de Nemours & Co.,*
  237 F.3d 371 (4th Cir. 2001) ................................................................... 25

*Harris Trust & Sav. Bk. v. Salomon Smith Barney, Inc.,*
  530 U.S. 238 (2000) ................................................................................. 17

*Hilao v. Estate of Marcos,*
  103 F.3d 767 (9th Cir.1996) ...................................................................... 4

*Howard v. Shay,*
  100 F.3d 1484 (9th Cir. 1996) .................................................................. 17

*In re Consolidated Welfare Fund ERISA Litigation,*
  798 F. Supp. 125 (S.D.N.Y. 1992) .............................................................. 8

*Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly,*
  572 F.3d 644 (9th Cir. 2009) ................................................................... 23

*Johnson v. Couturier,*
  573 F.3d 1067, 1077 (9th Cir. 2009) (9th Cir. 2009) ................................... 13

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

*Louis Vuitton Malleteer, S.A. v. cheapwholesalereplica.com*,
  2012 WL 12873547 (S.D. Fla. Mar. 22, 2012) ........................................ 2, 27

*MDPhysicians & Associates, Inc. v. State Bd. of Ins.*,
  957 F.2d 178 (5th Cir. 1992) ...................................................................... 11

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ...................................................................................... 7

*N.Y. State Teamsters Council Health and Hosp. Fund v. DePerno*,
  816 F. Supp. 138 (N.D.N.Y. 1993) ............................................................. 18

*Patelco Credit Union v. Sahni*,
  262 F.3d 897 (9th Cir. 2001) .......................................................... 17, 18, 19

*Pension Ben. Guar. Corp. v. Ross*,
  781 F. Supp. 415 (M.D.N.C. 1991) ............................................................. 16

*Peralta v. Hispanic Business, Inc.*,
  419 F.3d 1064 (9th Cir. 2005) .................................................................... 22

*Perez v. City National Corp.*,
  176 F. Supp. 3d 945 (C.D. Cal. 2016) ........................................................ 19

*Perez v. Wallis*,
  77 F. Supp. 3d 730 (N.D. Ill. 2014) ........................................................... 13

*Raich v. Ashcroft*,
  352 F.3d 1222 (9th Cir. 2003) ...................................................................... 9

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*,
  970 F.2d 552 (9th Cir. 1992) ........................................................................ 7

*Republic of the Philippines v. Marcos*,
  862 F.2d 1355 (9th Cir. 1988) .................................................................. 4, 8

*Santomenno v. Transamerica Life Ins. Co.*,
  883 F.3d 833 (9th Cir. 2018) ...................................................................... 19

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983)................................................................................ 7

*Sierra On–Line, Inc. v. Phoenix Software, Inc.*,
  739 F.2d 1415 (9th Cir. 1984) ............................................................ 9

*Solis v. Couturier, No. 2:08-cv-02732-RRB-*,
  2009 WL 1748724 (E.D. Ca. June 19, 2009) .................................... 24

*Solis v. Hartmann*,
  2012 WL 3779050 (N.D. Ill. 2012) .................................................. 18

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) .............................................................. 8

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013) .......................................................... 20

*United States v. Flores*,
  679 F.2d 173 (9th Cir. 1982) .............................................................. 4

*United States v. New York Tel. Co.*,
  434 U.S. 159 (1977)....................................................................... 8, 12

*United States v. Odessa Union Warehouse Co-op*,
  833 F.2d 172 (9th Cir. 1987) ......................................................... 9, 27

*United States v. Whiting*,
  471 F.3d 792 (7th Cir. 2006) ............................................................ 13

*Whitfield v. Tomasso*,
  682 F. Supp. ...................................................................................... 28

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).............................................................................. 9

*Wright v. Nimmons*,
  641 F. Supp. 1391 (S.D. Tex. 1986) .................................................. 22

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

*Yeseta v. Baima*,
  837 F.2d 380 (9th Cir. 1988) ............................................................... 14, 16

Statutes

28 U.S.C. § 1651 ..................................................................................... 3

29 U.S.C. §1105(a) ............................................................................... 19

29 U.S.C. § 403(c) ........................................................................... 20, 21

29 U.S.C. § 1002(21)(A) .................................................................. 17, 18

29 U.S.C. § 1002(40) ......................................................................... 7, 15

29 U.S.C. § 1101(a) .............................................................................. 10

29 U.S.C. § 1103(a) .............................................................................. 10

29 U.S.C. § 1104 .................................................................................. 10

29 U.S.C. § 1106 .................................................................................. 10

29 U.S.C. § 1104(a)(1)(A), (B) ............................................................. 24

29 U.S.C. § 1106(b)(1) ......................................................................... 21

29 U.S.C. § 1106(b)(2) ......................................................................... 22

29 U.S.C. § 1106(b)(3) ......................................................................... 22

29 U.S.C. § 1109 .................................................................................. 19

29 U.S.C. § 1109(a) .............................................................................. 11

29 U.S.C. §§ 1003(a), 1101(a), 1103, 1104, 1106 ................................ 13

29 U.S.C. § 2560.521-1(b)(1) ............................................................... 12

49 U.S. 1035 (1989) (1989) .................................................................. 11

Rules

Federal Rule of Civil Procedure 65 ...................................................... 12

Federal Rule of Evidence 801(d)(2)(D) .................................................. 4

Federal Rule of Evidence 803(6) ............................................................ 4

Federal Rule of Evidence 803(8)(A)(iii) ................................................. 4

Regulations

29 C.F.R. § 2509.78-5 .......................................................................... 17

29 C.F.R. § 2510.3-102 .................................................................................................. 16

29 C.F.R. § 2560.521-1(b)(1) ...................................................................................... 15

## I.   INTRODUCTION

The Riverstone Plan is a multiple employer welfare arrangement ("MEWA") that provides medical benefits to employers and their employees.  Due to Defendants' violations of their fiduciary obligations under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), the MEWA is woefully underfunded and has mounting unpaid medical claims exceeding $24 million as of late December 2018.  During this time, Defendants have enriched themselves through exorbitant compensation, as Riverstone alone collects a 20% "management fee" on all premiums collected, to the tune of over $11.66 million from January through November 2018.  Coupled with additional fees from brokers and other entities, between 40-45% of all premiums collected from employers are used to pay fees, leaving only 55-60% to pay employee medical claims.  Meanwhile, unsuspecting employers have joined the MEWA through participating ERISA plans ("Participating Plans") to provide affordable medical benefits for their employees, only to have these employees saddled with thousands of dollars in unpaid claims -- some facing escalating collections actions and others threatened with not being able to obtain necessary medical treatment.

Defendants have known of the MEWA's severe funding problems since at least January 2018, when they began delaying payment of claims and selectively choosing which claims to pay over others – literally deciding who may have access to their medical care.  Defendants began taking out high interest loans (some at a whopping 30-50% interest) to pay some medical claims and other expenses.  Some of these loans were taken using accounts receivable (in the form of future premiums to be collected from employers) as collateral.  Notably, despite these mounting funding concerns, Riverstone has never reduced its 20% management fee.

Over recent months, the gap between the amount of unpaid claims and the amount the MEWA has on hand to pay claims has only grown exponentially, as the MEWA has very low reserves and only collects about $4-6 million in premiums per month.  Brokers that represent over one-third of the MEWA's accounts have recently threatened to leave,

in part because the MEWA is attempting to change client agreements and belatedly correct its underfunding error by dramatically increasing premiums by as much as 200%. This is likely to cause the entire arrangement to collapse.  In short, the MEWA is unable to function properly and urgent action is required to mitigate the harm to the over 16,000 participants who will likely not have their medical bills paid.

Thus, in his application, the Secretary seeks judicial intervention to immediately restrain and enjoin Defendants from exercising any authority or control with respect to the management of the MEWA, the Participating Plans, and plan assets.  The Secretary also requests that the Court appoint an independent fiduciary to assume control of the management and administration of the MEWA and Participating Plans.  Among other things, the Secretary requests a temporary freeze be placed on specific bank accounts where plan assets are believed to exist, in order to preserve these assets from being improperly dissipated to pay Defendants, particularly because one Defendant has recently created an offshore account in the Cayman Islands, beyond the jurisdiction of this Court.  *See Louis Vuitton Malleteer, S.A. v. cheapwholesalereplica.com*, No. 1:12-CV-21026-KMM, 2012 WL 12873547, at *3 (S.D. Fla. Mar. 22, 2012) (*ex parte* order warranted when plaintiff has shown "Defendants will hide or transfer their ill-gotten assets beyond the jurisdiction of this Court unless those assets are restrained.").  The Secretary further requests that the independent fiduciary be permitted to conduct an accounting of all available assets, create a trust for the exclusive benefit of plan participants, administer and pay claims, pay service providers, and terminate the MEWA.  As detailed in the proposed order, the independent fiduciary should be granted exclusive control over Defendants' operations with respect to the MEWA and Participating Plans and be provided, by Defendants and their agents and employees, all information necessary to manage and administer the MEWA and Participating Plans. The Secretary further seeks an order pursuant to the All Writs Act, 28 U.S.C. § 1651,

staying, enjoining, and/or prohibiting any claims made against plan assets outside of procedures and processes to be set forth by the independent fiduciary.   Finally, the Secretary seeks an order that Defendants immediately provide notice to all employers and employee participants notifying them that their plans are underfunded and may not be able to pay past or future benefits so that they may make fully informed decisions regarding their health care.

The Secretary requests this TRO be issued *ex parte* in order to give control over these bank accounts to the independent fiduciary without first alerting Defendants who may attempt to move these assets.

The Secretary's Motion is supported by the Declaration of Michael Baron, Acting Senior Advisor for Health Investigations with the Los Angeles Regional Office of the Employee Benefits Security Administration of the U.S. Department of Labor ("EBSA") and attached Exhibits ("Baron Decl.").  A proposed Order is lodged concurrently.

## II.     FACTUAL BACKGROUND

Since 2014, Riverstone[1] has operated a self-funded welfare benefit arrangement offering health and welfare benefits for employees through participating employers. Starting with just two clients, the Riverstone MEWA has, as of December 2018, grown to approximately 112 employer clients and over 16,000 participants, primarily located in California.  Baron Decl. ¶ 5. [2]

---

[1] Corporate Defendants Riverstone Capital, LLC, NexGen Insurance Services Inc., and NGI Brokerage Services, Inc. are collectively referred to as "Riverstone."  All three entities share the same ownership, same officers, are headquartered at the same address, and have held themselves out to brokers and the public under the Riverstone business name.  *See, e.g.*, Riverstone Website, *available at*: https://rcwhms.com/about-us (last visited on Jan. 31, 2019).

[2] A MEWA is "an employee welfare benefit plan, or any other arrangement . . . which is established or maintained for the purpose of offering or providing any benefit described in [ERISA § 3(1)] to the employees of two or more employers (including one or more self-employed individuals)." 29 U.S.C. § 1002(40).

Riverstone's business concept was to offer low-cost medical benefits by setting premiums lower than the Kaiser Permanente HMO, which it believed was the lowest cost fully-insured product on the market.  Baron Decl., Exh. 8 (James Kelly Interview (Riverstone President and CEO), p. 3, ¶ 2).[3]  Riverstone attempted to keep costs low by requiring participating employers to submit health questionnaires as part of their application for coverage in order to select only "healthy" groups to participate.  Baron Decl. ¶ 6.

Riverstone oversaw this arrangement by, among other things, hiring brokers to market coverage to prospective employer clients and third party claims administrators ("TPAs") Hawaii Mainland Administrators ("HMA") and S&S Healthcare Strategies, Ltd. ("S&S") to process claims.  Baron Decl., Exh. 2 (Sample Broker Agreement); Exh.

---

[3] Interviews taken of Defendants Robert Clarke, Travis Bugli, and Robert Kelly and Riverstone Controller Louise Gold by Department of Labor investigators are each admissible against Riverstone as party admissions under Federal Rule of Evidence 801(d)(2)(D) as they are statements made by Riverstone agents concerning matters within the scope of their agency or employment and were made during the existence of that relationship.  Interviews taken of Paul Carter (HMA Chairman and CFO) and David Appel (HMA Vice President of Finance) are also admissible as they were acting as Riverstone agents for claims processing, their statements concerned matters within the scope of their agency and were made during the existence of their relationship.  *See Hilao v. Estate of Marcos*, 103 F.3d 767, 775 (9th Cir.1996); *see also United States v. Flores*, 679 F.2d 173, 178 (9th Cir. 1982), *cert. denied*, 459 U.S. 1148 (1983).  EBSA's investigative records are also admissible on the additional grounds that they are public records setting out the factual findings from a legally authorized investigation pursuant to FRE 803(8)(A)(iii) and were records kept per regularly conducted activity pursuant to FRE 803(6).  EBSA's records were made at or near the time the investigation occurred by EBSA individuals with knowledge, were kept in the course of EBSA's regular conducted activity of investigating ERISA compliance, and making such records was a regular practice of EBSA individuals investigating ERISA compliance.  *See* Fed. R. Evid. 803(6).  Finally, even if none of these exceptions apply, the Ninth Circuit has held that district courts may consider hearsay evidence in deciding whether to issue preliminary injunctions. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc).

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

3 (Sample Agreement with HMA); Exh. 4 (Sample Agreement with S&S).  Each of these entities had contracts directly with Riverstone, and Riverstone paid them for their services.  *Id.*  Once an employer agreed to participate in the Riverstone MEWA, a broker worked with the TPA to help the employer apply for coverage.  Baron Decl., Exh. 10 (Travis Bugli Interview (Riverstone COO), p. 2, ¶ 50).  Once approved, Riverstone required employers to sign administrative service agreements (ASAs) with the TPAs (either HMA or S&S), which were generally similar for all employer clients. Baron Decl., Exh. 5 (Sample ASA).  Employers were then sent largely identical plan documents by their TPA.  Many of these plan documents were not signed by participating employers.  Baron Decl., Exh. 1 (Sample Plan Document).  Up until around August 2017, Riverstone did not complete an agreement directly with its employer clients on a widespread basis.  Baron Decl., Exh. 11 (Louise Gold Interview (Riverstone Controller), p. 4, ¶ 17)

Premiums were uniform among some employers, regardless of size. Baron Decl., ¶ 7.  Riverstone guaranteed premium rates for up to two years for some clients.  Baron Decl., Exh. 19 (Riverstone Rate Guarantee Letter). Premiums were sent, usually electronically, by employer clients to Riverstone's corporate bank account.  *E.g.,* Baron Decl., Exh. 16 (Sample Riverstone Bank of America account statement (ending 5003).) Riverstone officials then transferred funds into other accounts, all held in Riverstone's name, as needed.  Thus, premiums collected from over 100 participating employers were commingled and never kept in trust.  *See* Baron Decl., Exh. 11 (Gold Interview), p. 4, ¶ 18.

Riverstone collected a 20% management fee on all premiums paid for its services. Baron Decl., Exh. 14 (Riverstone Trial Balance Spreadsheet).  Coupled with TPA, broker, and other services, fees totaled approximately 40-45% of premiums collected, leaving 55-60% to pay employee medical claims.  *See id.*  Riverstone retained its 20% fee as a "reserve" which would be put at risk in the event an employer's claims exceeded its premiums paid after expenses.  Baron Decl., Exh. 6.  Riverstone's fee was not clearly

disclosed to employer clients until Riverstone began entering into client service agreements.  *See id.*

Riverstone grossly underestimated the funds needed to pay medical claims. Starting in at least January 2018, one TPA noticed that Riverstone began delaying paying approved medical claims, which were processed by TPAs but could only be paid after being authorized and released by Riverstone officials.  Riverstone began 'cherry picking' which claims to pay.  Baron Decl., Exh. 12 (Paul Carter Interview (HMA Chairman and CFO), p. 6, ¶ 32.  Riverstone began using one employer's premiums to pay the claims of another.  *Id.*, Exh. 11, pp. 6-7, ¶ 32.  Several participants have had unpaid medical claims sent to collections.  Others have been threatened with loss of coverage due to nonpayment.  One participant has had a provider tell him that they no longer accept Riverstone due to nonpayment of claims.  Baron Decl., ¶ 35.

Between April and June 2018, Riverstone took out five merchant cash advance (MCA) high interest loans to pay unpaid medical claims and Riverstone's operating expenses.   Baron Decl., Exh. 11, ¶¶ 35-36.  Riverstone took out three additional loans between December 2017 and August 2018.  Baron Decl. ¶ 14. Interest rates on some of these loans ranged from 30-50% and many were taken using accounts receivable (in the form of future premiums to be collected from employers) as collateral.  *Id.*; *see also id.*, Exh. 11, p. 8, ¶ 39.

The Secretary initiated its investigation of Riverstone in late July 2018.  Since that time, he has received documents from Riverstone and subpoenaed third parties.  Baron Decl. ¶ 4.  The Secretary has recently obtained information that Riverstone is attempting to correct its underfunding error by dramatically increasing premiums for employer clients regardless of whether they are up for renewal.  Baron Decl., Exh. 26 (Riverstone Letter to Employer Client reflecting premium rate increase of 200%); Exh. 27 (Riverstone Letter to Employer Client reflecting premium rate increase of 96%).  The Secretary has also learned that a broker for approximately one-third of Riverstone's clients and approximately one half of the people covered by Riverstone has indicated

that they intend to recommend their clients leave the MEWA.  *Id.*, Exh. 28 (Riverstone broker email).  This highlights the urgency of the situation as this arrangement is on the verge of collapse.

## III.    ARGUMENT

### A.    Legal Framework

1.    The Court has Broad Authority under ERISA to Grant the Relief Sought.

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).  Section 503(a)(5) of ERISA specifically authorizes the Secretary to bring an action "to enjoin any act or practice which violates any provision of [Title I of ERISA], or to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of [Title I]."  As set forth below, Defendants have violated their fiduciary obligations under Title I of ERISA, giving rise to the instant application and providing for the requested relief.  *See, e.g., Donovan v. Mazzola*, 716 F.2d 1226, 1238-39 (9th Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984) ("In enacting ERISA Congress intended to provide courts with the broad and flexible equitable remedies of traditional trust law in cases involving breaches of fiduciary duty.").

ERISA specifically authorizes removal of a breaching fiduciary.  29 U.S.C. § 1109(a); *see Mertens v. Hewitt Assocs.,* 508 U.S. 248 (1993) (a fiduciary is subject to such other equitable or remedial relief as the court may deem appropriate including removal of the fiduciary).  In addition to providing for the removal of existing plan fiduciaries, such relief also includes the appointment of an independent fiduciary to carry out the proper administration and management of benefit plans.  *Mazzola,* 716 F.2d at 1238-39.

Moreover, district courts have "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief."  *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992).  That inherent authority extends to "the power to issue a preliminary injunction to prevent a defendant from

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

7

dissipating assets in order to preserve the possibility of equitable remedies." *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1364 (9th Cir. 1988) (en banc), *cert. denied*, 49 U.S. 1035 (1989); *see also F.T.C. v. H. N. Singer, Inc.,* 668 F.2d 1107, 1112 (9th Cir. 1982) (courts have the authority to order provisional injunctive relief to enable final equitable relief).

Under the All Writs Act, this Court may issue orders as may be necessary or appropriate to effectuate its orders and/or prevent frustration of its orders. *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977). This power extends to persons "who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice . . . ." *Id.* The All Writs Act is available to stay actions by non-parties and has been used in at least three similar cases involving woefully underfunded ERISA plans subject to mounting litigation. *See Cutler v. The 65 Security Plan*, 831 F. Supp. 1008 (E.D.N.Y. 1993); *In re Consolidated Welfare Fund ERISA Litigation*, 798 F. Supp. 125 (S.D.N.Y. 1992); *Acosta v. AEU Benefits, LLC, et al.*, Case No. 17-cv-7931-JHL-SMF (N.D. Ill. Apr. 18, 2018) (Dkt. 146). Most recently, in *AEU Benefits*, another case litigated by the Secretary, the district judge granting a TRO and entering an order staying, enjoining and/or prohibiting any person or entity from raising claims against plan assets outside procedures and processes set forth by the appointed independent fiduciary. *See* Dkt. 146 at p. 3. The Secretary seeks similar relief here.

Thus, the Secretary's requests fall squarely within ERISA's statutory charge and are in furtherance of the Secretary's goal of protecting plan participants and beneficiaries. Given the broad equitable relief available under ERISA, this Court has the authority to grant the relief requested by the Secretary.

## 2. Standard for Issuing a TRO

The legal standards applicable to TROs and preliminary injunctions are "substantially identical." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A party seeking a TRO under Federal Rule of

Civil Procedure 65 must establish that: (i) he is likely to succeed on the merits of his claims; (ii) he is likely to suffer irreparable harm without preliminary relief; (iii) the balance of equities tips in his favor; and (iv) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (discussing standard for preliminary injunction); *Raich v. Ashcroft*, 352 F.3d 1222, 1227 (9th Cir. 2003). Alternatively, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (citation omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

Further, the Ninth Circuit has held that if a party seeks a preliminary injunction to prevent a violation of a federal statute and that statute specifically provides for injunctive relief, the moving party does not need to show irreparable harm. *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987); *see also Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175–76 (9th Cir. 2010) ("The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief.") (internal citations and quotation marks omitted).

As set forth below, the Secretary easily meets the requirements for a TRO and preliminary injunction. Because the Secretary is seeking to enjoin Defendants from violating ERISA, and Section 503(a)(5) of the Act specifically provides for injunctive relief, he need not show irreparable harm for the Court to issue an injunction. *See Odessa,* 833 F.2d at 175; *Antoninetti*, 643 F.3d at 1175-76.  However, the Secretary has taken the additional step in this case of showing that an injunction is necessary to prevent irreparable harm.

**B.    The Secretary is Entitled to a TRO and Preliminary Injunction.**

1.    <u>**There is More Than a Reasonable Likelihood that the Secretary Will Succeed on the Merits.**</u>

To prevail on the merits, the Secretary must establish:  (1) the existence of an employee benefit plan covered by ERISA; (2) the existence of plan assets; (3) Defendants are fiduciaries to ERISA-covered plans; and (4) Defendants breached any of their fiduciary duties under ERISA.  *See* ERISA §§ 4(a) (ERISA coverage of employee benefit plans), 401(a) (fiduciary responsibility coverage), 403 (trust requirement), 404 (prudence requirement), and 406 (prohibitions against self dealing); 29 U.S.C. §§ 1003(a), 1101(a), 1103, 1104, 1106.  Riverstone violated ERISA § 403 by failing to hold premiums in trust on behalf of the Participating Plans and instead commingling all premiums from over 100 employer clients into Riverstone's general corporate account.  Riverstone violated ERISA 406(b)'s prohibitions against self-dealing by retaining compensation out of plan assets at the expense of the plans.  Individual Defendants also violated ERISA 406(b) by taking partnership distributions and luxury car payments out of plan assets.  Finally, Defendants each breached ERISA § 404(a)'s prudence requirement by failing to act solely in the plan and participants' interests by continually failing to pay processed claims, failing to disclose severe underfunding problems, and operating a MEWA without a license.  Each violation is discussed in greater detail below.[4]

i.    **The Participating Plans are Covered by ERISA.**

---

[4] The below referenced ERISA violations are not exhaustive of all violations potentially committed by Defendants and other as-yet unnamed entities or individuals.  As information continues to be obtained by the Secretary, additional allegations may be made and pleadings will be amended as soon as possible, but the below form the basis of the instant TRO application.  Moreover, any violation of Title I of ERISA renders the Secretary's requested relief appropriate; here, the Secretary simply discusses ERISA § 403, 404, and 406 to show the breadth of Defendants' violations.

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

An ERISA plan can be established "rather easily."  *Credit Managers Ass'n v. Kennesaw Life & Acc. Ins.*, 809 F.2d 617, 625 (9th Cir. 1987).  To determine whether an ERISA covered plan has been established or maintained by an employer, a court must determine: (1) whether, from the surrounding circumstances, a reasonable person can ascertain the existence of an individual employer plan given, for example, an identifiable class of beneficiaries, a source of financing, and a process for obtaining the benefits, *Diak v. Dwyer, Costello & Knox*, 33 F.3d 809, 812 (7th Cir. 1994) (citation and internal quotation mark omitted); and (2) that the plan has been "established or maintained" by the employer.  *See MDPhysicians & Associates, Inc. v. State Bd. of Ins.*, 957 F.2d 178, 183 (5th Cir. 1992).  The level of employer involvement required is not high.  *See Kennesaw Life*, 809 F.2d at 625 ("Even if an employer does no more than arrange for a 'group-type insurance program,' it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of employees.").

Here, both prongs are met.  Employers in the MEWA each chose to establish their own plan that provided employees with full medical, dental, and prescription drug coverage.  Defendants or their brokers then provided Participating Plans with relevant Plan documents that specified these were ERISA covered plans created to provide welfare benefits and outlining a class of beneficiaries, financing, and a process for obtaining benefits. *See* Baron Decl., Exh. 1 (Sample Plan Document), p. 4 (specifying that "ERISA governs the Plan").  Each of the Participating Plans had Plan documents that similarly laid out their coverage.  Baron Decl., ¶ 8.  In a FAQ sent to brokers marketing the MEWA, Riverstone itself acknowledged that "these [participating] plans are governed under ERISA" in an apparent attempt to show that they were not subject to state regulation.  Baron Decl., Exh. 23 (NexGen Insurance Broker Questions and

Answers) FAQ No. 19.[5]

### ii.    All Premiums Paid to the MEWA are Plan Assets.

The term "assets of the plan" should also be read "broadly" in light of "Congress'
overriding concern with the protection of plan participants and beneficiaries[.]" *Acosta
v. Pac. Enterprises*, 950 F.2d 611, 620 (9th Cir. 1991), *as amended* (Jan. 23, 1992)
(citations omitted). To that end, the Ninth Circuit has rejected any "restricted definition"
of the term "plan assets" in favor of a "functional approach," explaining that it is
"necessary to determine whether the item in question may be used to the benefit
(financial or otherwise) of the fiduciary at the expense of plan participants and
beneficiaries." *Id.*

Here, all premium payments from participating employers (comprised of both
employee and employer contributions in different ratios depending on the employer)
were plan assets at the time they were segregated from each employer's general assets
and deposited to Riverstone's general bank account.  Riverstone did not maintain
separate bank accounts for each employer's premiums, but commingled contributions
from over 100 participating employers into one of its general accounts.  Riverstone did
not segregate premium contributions or fees from Riverstone's general corporate assets,
although it allegedly tracked the funds in the general ledger.  *See* Baron Decl., Exh. 11
(Gold Interview), ¶¶ 12, 18.

For the portion comprised of employee contributions, the Secretary's regulations

---

[5] The MEWA itself was a service provider MEWA.  Although the MEWA may not
directly be covered by ERISA, the Secretary has enforcement authority over the
operations of the MEWA because it offers benefits in connection with the underlying
ERISA covered plans.  *See* 29 C.F.R. § 2560.521-1(b)(1) (a MEWA "is an arrangement
as defined in section 3(40) of ERISA [29 U.S.C. § 1002(40)] that either is an employee
welfare benefit plan subject to Title I of ERISA *or offers benefits in connection with one
or more employee welfare benefit plans subject to Title I of ERISA*.") (emphasis added).

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

conclusively establish employee contributions become plan assets after they are segregated from the employer's account.  29 C.F.R. § 2510.3-102; *see United States v. Whiting*, 471 F.3d 792, 799 (7th Cir. 2006); *see, e.g., Perez v. Wallis*, 77 F. Supp. 3d 730, 742 (N.D. Ill. 2014). The employee contributions are segregated from the employer's account when they are sent to Riverstone, and thus become plan assets at that time. *Id.*

Similarly, employer contributions become plan assets the moment they are sent by employers to Riverstone, as they have been segregated from the employer's assets at that point.  Contributions then remain plan assets until they are used to pay claims or necessary plan expenses.[6]  Notably, Defendants themselves identified premiums paid by Participating Plans as plan assets.  Baron Decl., Exh. 23 (FAQ No. 16: "Who is paying your claims after your employees meet their deductibles and out of pockets? [Answer:] *All claims are paid out of the plan assets, which is* [sic] *collected on a monthly basis.* This is a level self-funded plan.") (emphasis added); *see also* Exh. 19 (Riverstone Rate Guarantee Letter referring to premiums as "plan assets").

### iii.    Defendants are ERISA Fiduciaries.

Fiduciary duties under ERISA are the "highest known to the law."  *Johnson v. Couturier*, 573 F.3d 1067, 1077 (9th Cir. 2009) (*citing Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996), *cert. denied*, 520 U.S. 1237 (1997) (*quoting Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982), cert. denied, 459 U.S. 1069 (1982))).  ERISA provides a "broad definition" of fiduciary, *see* 29 U.S.C. § 1002(21)(A), to include anyone who can, or does, exercise discretionary authority or control over the

---

[6] Although the Secretary has not issued regulations regarding the plan asset status of employer contributions to a welfare plan, the Secretary has maintained that employer contributions are to be identified as plan assets on the basis of ordinary notions of property rights.  *See generally Central Illinois Carpenters Health & Welfare Trust Fund v. S&S Fashion Floors, Inc.*, 516 F.Supp.2d 931, 934 (C.D. Ill. 2007).

management or administration of an employee benefit plan. *See Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997). "Fiduciary status under ERISA is to be construed liberally, consistent with ERISA's policies and objectives." *Id.* (citation omitted). ERISA recognizes that "some offices of an employee benefit plan, such as trustee or plan administrator, by their very nature require those who hold them to perform fiduciary functions[.]" *Donovan v. Mercer*, 747 F.2d 304, 309 (5th Cir. 1984) (*citing* 29 C.F.R. § 2509.78-5 at D-3); *Yeseta v. Baima*, 837 F.2d 380, 384 (9th Cir. 1988) (same).

Even if not named as a fiduciary in the plan instruments, a party is an ERISA fiduciary, among other reasons, to the extent he has, or exercises, any discretionary authority or control over management of the plan or its assets. *See* 29 U.S.C. § 1002(21)(A) (defining ERISA fiduciary). The Ninth Circuit has expressly held that there need not be an express delegation of fiduciary authority for persons performing duties of a fiduciary nature to be considered fiduciaries. *Concha v. London*, 62 F.3d 1493, 1501-02 (9th Cir. 1995).

### a.  Riverstone

Defendant Riverstone is a functional fiduciary to the Participating Plans because it exercises discretionary control over all plan assets.  All bank accounts are held in Riverstone's name and only Riverstone employees have signatory authority over those accounts.  *See* Baron Decl., Exh. 16 (Sample Bank Statement); Exh. 17 (Bank Signature Card); Exh. 11, pp. 4-5.  Notably, in a FAQ to brokers, Riverstone identified itself as "the plan administrator" that "acts as the gate keeper and plan manager."  Baron Decl., Exh. 23.  *See* Mercer, 747 F.2d at 309 (role of plan administrator, by its very nature, requires it to perform fiduciary functions).  Further, Riverstone admits it is responsible for paying all claims.  Baron Decl., Exh. 9 (Clarke Interview), p. 3.

### b.  Travis Bugli

Bugli is Riverstone's COO, Founding Partner, and Board of Directors member who oversees its operations, claims management, and billing.  Baron Decl., Exh. 10 (Bugli Interview, p. 3) Among other things, Bugli signs the master service provider agreements with third party claims administrators (HMA and S&S), brokers, client services agreements with employers, and loan agreements with lenders.  Baron Decl., Exh. 6 (Sample Client Agreement).  Bugli authorizes payments from Riverstone's accounts to pay claims.  *Id.*, Exh. 20 (Riverstone broker email identifying Bugli as a claims authorizer).  Bugli signed checks out of all three Riverstone's primary Bank of America accounts.  *Id.*, EBSA Exh. 21 (Sample Check). Bugli has always provided final approval on medical claim payments since the Riverstone's inception.  *Id.*, Exh. 11, pp. 3-4.  Bugli also sets the initial rates for new clients. *Id.*

### c.  James Kelly

Kelly is Riverstone's CEO, President, Founding Partner, and Board of Directors member who is responsible for the day-to-day management of its personnel and managing medical provider cost.  Baron Decl., Exh. 8 (Kelly Interview), pp. 1-2.  He makes joint decisions with Bugli on Riverstone's behalf regarding major expenditures, hiring, and selection of service providers.  *Id.*  Kelly signed loan agreements on Riverstone's behalf, including agreements that encumbered its future receivables.  *Id.*, ¶ 14; Exh. 7 (Sample Loan Agreement).

### d.  Robert Clarke

Clarke is President of Riverstone's Brokerage Services Division, Partner, and Board of Directors member who works with brokers to market Riverstone services and with Riverstone's territorial managers to develop relationships with brokers.  Baron Decl., Exh. 9 (Clarke Interview), p. 1.  Clarke signs broker agreements on Riverstone's behalf and sends information to brokers outlining Riverstone's role as, among other things, plan administrator to the Participating Plans.  Baron Decl., Exh. 23.

iv.     **Defendants are liable for any breaches by co-fiduciaries.**

As fiduciaries, Defendants are each personally liable for any losses to the Participating Plans stemming from their fiduciary breaches, 29 U.S.C. § 1109; *Yeseta*, 837 F.2d at 384. They are also liable for breaches committed by any co-fiduciary if, among other things, by their failure to act prudently, they enabled any of the other fiduciaries to commit a breach.  29 U.S.C. §1105(a); *see, e.g.*, *Pension Ben. Guar. Corp. v. Ross*, 781 F. Supp. 415, 420 (M.D.N.C. 1991).

v.     **Defendants Breached their Fiduciary Duties.**

a.     **Violation of ERISA § 403: Failure to Hold Plan Assets in Trust and Have a Trustee.**

ERISA Section 403(a), often referred to as the "hold in trust" requirement, requires that "all assets of an employee benefit plan shall be held in trust by one or more trustees[.]"  29 U.S.C. § 1103(a); *see also Barboza v. California Ass'n of Professional Firefighters,* 799 F.3d 1257, 1262 (9th Cir. 2015).  Neither ERISA nor the regulations define the terms "trust," "trustee," or "trust instrument."  *See id.*  Thus, the Ninth Circuit has applied common law definitions to hold that Section 403(a) requires that a person, legal or natural, must hold legal title to the assets of an ERISA employee benefit plan with intent to deal with these assets *solely* for benefit of members of that plan.  *See Barboza*, 799 F.3d at 1265-66; *see also* 29 U.S.C. § 403(c) (plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

Here, Riverstone clearly violated Section 403.  All premiums sent by Participating Plans to Riverstone to pay health claims were simply held in Riverstone's name in its general banking account.  That is, contributions from over 100 participating employers were simply commingled without any trust, any form of a trust agreement, or any other document even attempting to establish a trust or name a trustee.  *See* Baron Decl., Exh.

11 (Gold Interview), pp. 3-4.  Riverstone did not segregate premium contributions or management fees from its general corporate assets (although Riverstone claims it tracked funds in a general ledger) and did not maintain separate bank accounts for each employer's premiums.  *Id.*  Under this arrangement, there was, by Defendants' own account, no trust and no trustee who could ensure that plan assets were "held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  29 U.S.C. § 403(c).[7]

### b.  Violation of ERISA § 406(b): Self Dealing with Plan Assets and Setting own Compensation.

By enacting ERISA § 406, Congress strengthened and supplemented ERISA's exacting fiduciary standards "by categorically barring certain transactions deemed 'likely to injure the [] plan.'"  *See Harris Trust & Sav. Bk. v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000) (citation omitted). As the Ninth Circuit has made clear, ERISA § 406(b) "creates a per se ERISA violation," establishing "a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans."  *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001). A fiduciary's intent is irrelevant, as a § 406(b) violation may exist "even in the absence of bad faith, or in the presence of a fair and reasonable transaction[.]"  *Id.*

---

[7] Around July 2018, after the Department of Labor initiated its investigation, Riverstone created some separate bank accounts in the name of individual employers.  However, these do not qualify as trusts because contributions were still sent to Riverstone's general bank account (ending in 5003) and Riverstone generally only sent amounts for approved claims directly to those accounts as pass-through accounts.  That is, these pass-through accounts did not hold all the premium amounts remitted by a Participating Plan and only kept enough per month to pay approved claims. Thus, premium payments that were plan assets remained commingled in Riverstone's general account and were not held for the exclusive benefit of each plan's participants.  *See* 29 U.S.C. § 403(c).

ERISA § 406(b)(1) broadly provides that a plan's fiduciary "shall not – (1) deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). The term "interest" should be construed broadly, as ERISA § 406 is "designed to prevent the use of plan assets for any interest, financial or nonfinancial, other than an interest of the plan and its beneficiaries." *N.Y. State Teamsters Council Health and Hosp. Fund v. DePerno*, 816 F. Supp. 138, 147 (N.D.N.Y. 1993) (emphasis added and citation omitted).

ERISA § 406(b)(2) prohibits a fiduciary from acting in any transaction involving the plan on behalf of a party whose interests are adverse to those of the plan or its participants and beneficiaries. 29 U.S.C. § 1106(b)(2). A party's "adverse" interests need only be different, not antithetical. *Solis v. Hartmann*, 2012 WL 3779050, at *7 (N.D. Ill. 2012) (citation omitted); *Mazzola*, 716 F.2d at 1238 ("at the heart of the fiduciary relationship is the duty of complete and undivided loyalty to the beneficiaries of the trust") (citation omitted); *Cutaiar v. Marshall*, 590 F.2d 523, 530 (3d Cir. 1979) (fiduciaries who act on both sides of a transaction involving the plan cannot negotiate the best terms for the plan).

ERISA § 406(b)(3) prohibits a fiduciary from, among other things, receiving "consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). The Ninth Circuit has held that a fiduciary's receipt of compensation from self-dealing in the form of commissions, constitute a violation of ERISA § 406(b)(3). *See Patelco Credit Union v. Sahni,* 262 F.3d 897, 911 (9th Cir. 2001).

Here, Riverstone violated ERISA § 406(b)(1), (2), and (3) by setting its management fee at 20% and paying itself out of plan assets. Thus, Riverstone violated ERISA § 406(b)(1) by dealing with plan assets for its own account. In so doing, Riverstone received a benefit for its own financial interest at the expense of the plans and their participants given that Riverstone's compensation directly reduced plan assets.

Riverstone also violated ERISA § 406(b)(2) by acting in a transaction involving plans on behalf of a party (i.e., itself), whose interests were adverse to the plans' interests given that it would receive compensation out of plan assets. Further, it violated ERISA § 406(b)(3) through self dealing and receiving consideration out of plan assets. Riverstone's fees do not appear to have been disclosed in writing to participating employers until August 2017 at the earliest, which is when Riverstone admits it started entering into written agreements with clients. *See* Baron Decl., Exh. 11, p. 4, ¶17; Exh. 6 (Sample Client Agreement). According to a trial balance produced by Riverstone, its management fee totaled $11.66 million between January through November 2018. *Id.*, Exh. 14 (Trial Balance spreadsheet). Riverstone's management fee was not tethered to any direct expenses for the Plans, and to the extent Defendants may attempt to argue that their fee amounts to "reasonable compensation," the Ninth Circuit has squarely rejected another fiduciary's argument that their ERISA § 406(b) violations could similarly be excused. *See Patelco,* 262 F.3d at 910 (rejecting ERISA fiduciary's claim that his ERISA § 406(b) violations were excused because he only received "reasonable compensation"); *see also Perez v. City National Corp.,* 176 F. Supp. 3d 945, 949 (C.D. Cal. 2016) (same); *cf. Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 841 (9th Cir. 2018) (holding that if a "service provider's definitively calculable and nondiscretionary compensation is clearly set forth in a contract with the fiduciary-employer, collection of fees out of plan funds in strict adherence to that contractual term" may not constitute plan assets). *Santomenno* is distinguishable given that Riverstone's 20% fee was not contractually agreed upon on a widespread basis until August 2017 at the earliest when Riverstone began entering into written agreements with some employer clients. Moreover, even after that date, its fees remained a plan asset because Riverstone contractually agreed to put its fee "at risk" in the event that a participating plan was underfunded, and Riverstone did not segregate the fees from other plan assets in strict adherence to contractual terms.

Further, individual Defendants Bugli, Kelly, Clarke further violated ERISA § 406(b)(1) and (3) by using plan assets to enrich themselves in the form of partnership distributions paid out of plan assets.  Baron Decl., Exh. 21 (Sample Partnership Distribution Checks).  Bugli, Kelly, and Clarke also violated ERISA § 406(b)(1) and (3) by having luxury car leases paid out by plan assets.  *See id.*, Exh. 11, p. 13, ¶ 69 (Mercedes, Porsche, other luxury car lease details); Exh. 18 (Bank statement showing Porsche payment).

### c.   Violation of ERISA § 404(a): Failure to Act Prudently and Solely in the Interest of Plan Participants and Beneficiaries Which Has Resulted in Millions in Unpaid Claims

ERISA § 404(a)(1) requires that fiduciaries act "solely in the interest" of plan participants and beneficiaries. Subsection (A) requires a fiduciary to act "for the exclusive purpose" of providing benefits to plan participants and beneficiaries and defraying reasonable plan administration expenses. Subsection (B) further requires a fiduciary to act with the heightened "care, skill, prudence, and diligence" required of an ERISA fiduciary. 29 U.S.C. § 1104(a)(1)(A), (B). This prudence requirement asks more than that of a lay person, "but of one experienced and knowledgeable" on ERISA matters and is "more exacting" than "the business judgment rule so familiar to corporate practitioners." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1145 (9th Cir. 2013) (citation omitted), *overruled on other grounds in* 135 S. Ct. 1823 (2015); *Mazzola*, 716 F.2d at 1231 (same).

Defendants each breached their fiduciary duties by continually failing to pay processed claims and failing to disclose to employers the significant underfunding of the MEWA.  According to two TPA officers, Riverstone started to delay paying claims between January to August 2018.  Baron Decl., Exh. 12, p. 6, ¶ 32 (HMA Chairman stating that since January/February 2018, Riverstone began holding off on paying claims, which has only worsened over time and that Riverstone picks which claims to

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

pay and which to delay); Exh. 13 (David Appel Interview), pg.7 (HMA VP of Finance

stating that for at least last two months before October 2018, Bugli had been picking and

choosing which claims batches to pay).  Despite this knowledge, Defendants failed to

inform existing employers or newly enrolled employers of the MEWA's dire financial

situation.  Throughout 2018, Defendants have continued to allow enrollment of

additional employers in the MEWA, well aware of the potential harm facing these new

participants.

Defendants can hardly claim they were unaware of the MEWA's problems with

unpaid claims and poor funding.  Claims administrators, HMA and S&S, sent numerous

emails to Riverstone requesting funding to pay the unpaid claims throughout 2018.

Baron Decl., Exh. 24 (HMA October 2018 email to Riverstone referencing "urgent"

outstanding claims and stating "**Please be advised this is not a full urgent batch list**

[of unpaid claims]**, as it continues to grow.**") (emphasis in original); *see also* Exh. 25

(HMA December 2017 email to Riverstone reference "**urgent** batch" and stating that

"This is a cancer patient that the provider will stop seeing if payment = is not received.

Please let me know when the payments are authorized . . . .") (emphasis in original).

Riverstone itself took out high interest loans beginning in December 2017 to help cover

unpaid claims.  *Id.*, Exh. 11, pp. 7-8, ¶¶ 35-41.  In response to earlier questions from

HMA about unpaid claims, Bugli told Carter that Riverstone was attempting to raise

more money and that they were telling employer clients to put more funds into their

arrangement.  *Id.*, Exh. 12, p. 6, ¶ 32.

Under these circumstances, a prudent fiduciary would inform existing employers

of these funding and claims payment issues and surely would not continue to enroll new

employers in the MEWA.  A prudent fiduciary focused solely on the interest of plan

participants would not subject them to a plan that fails to pay claims.  *See Griggs v. E.I.*

*DuPont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) (an "ERISA fiduciary that

knows or should know that a beneficiary labors under a material misunderstanding of

plan benefits that will inure to his detriment cannot remain silent – especially when that

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

21

misunderstanding was fostered by the fiduciary's own material representations or omissions"); *see also Becker v. Eastman Kodak Co.*, 120 F.3d 5, 9 (2d Cir. 1997) (fiduciaries can violate § 404 obligations by misleading participants through both action or inaction); *Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064 (9th Cir. 2005) ("while there is no express statutory requirement to notify participants in a timely fashion of plan cancellation, such a requirement is implicit in the structure and purpose of ERISA, and is more vital than the ordinary technical reporting and disclosure requirements.  Employees are entitled to know if they have or do not have an ERISA plan" and failure to do so violates ERISA § 404(a)).

Riverstone further violated ERISA § 404(a)(1)(A) and (B) by operating as a MEWA without a state license as required under California law.  To be clear, the Secretary is not seeking to enforce state law requirements, which are within the jurisdiction of the California Department of Insurance.  Rather, Riverstone's failure to abide by clear MEWA operating requirements demonstrates its lack of prudence as an ERISA fiduciary.  *See, e.g.*, *Wright v. Nimmons*, 641 F. Supp. 1391, 1403 (S.D. Tex. 1986) (failure to respond to IRS requests gave rise to ERISA § 404 violation for failure to act prudently).

2. **Absent immediate injunctive relief, the Secretary, the public, and Defendants' employees will continue to suffer irreparable harm.[8]**

The irreparable harm that participants have suffered, and will continue to suffer, is apparent. Several participants have had unpaid medical claims sent to collections, and only more will occur absent judicial intervention. Baron Decl., ¶ 35. Participants have already been threatened with denial of access to medical care. *Id.* One participant was notified by his provider that they were no longer accepting Riverstone due to nonpayment of claims. *Id.* Given that there are over 16,000 plan participants, it is likely that many more have faced collections actions or threatened loss of coverage and that others may have no idea at all that their health benefits are in dire jeopardy.

This urgency is compounded by the fact that Defendant Bugli has recently created an account in the Cayman Islands in which he is the sole owner. Riverstone recently transferred $200,000 to this account, which is beyond the jurisdiction of this Court, and the Secretary is concerned that remaining plan assets may be dissipated. *See* Exh. 18 (October 2018 Riverstone bank statement showing wire transfer); Exh. 11 (Gold Interview), ¶ 51 (referencing Cayman Islands account); Exh. 10 (Bugli Interview), ¶¶ 45-46 (stating that he is 100% owner of a corporation recently created in the Cayman Islands and when asked why it was created in that location, Bugli stated that it was "not allowed in California"); *see Louis Vuitton Malleteer, S.A.*, 2012 WL 12873547, at *3 (granting *ex parte* relief when defendant may transfer funds beyond the court's jurisdiction).

3. **The balance of equities tilts sharply in the Secretary's favor and an injunction is in the public interest.**

In balancing the hardship that may result from the issuance of an injunction, the public interest is entitled to great consideration. *See Independent Living Ctr. of S. Cal.*,

---

[8] As noted above, the Court may enter a TRO in this case without finding irreparable harm. *See Odessa,* 833 F.2d at 175; *Antoninetti,* 643 F.3d at 1175-76. The Secretary,

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

*Inc. v. Maxwell-Jolly*, 572 F.3d 644, 657-58 (9th Cir. 2009). Recognizing the public interest in protecting against future harm to ERISA plans, courts have rejected arguments that "ERISA fiduciaries and their associates must be allowed to loot a second pension plan before an injunction may be issued." *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991); *Solis v. Couturier*, No. 2:08-cv-02732-RRB-GGH, 2009 WL 1748724, *7 (E.D. Ca. June 19, 2009). "Accordingly, injunctive relief is available including an injunction to prohibit a party from having further dealings with ERISA-covered plans." *Whitfield*, 682 F. Supp. at 1306.

Here, the harm that would likely occur without an injunction "would leave . . . participants without the benefits whose security ERISA strives above all else to protect." *Couturier*, 572 F.3d at 1081.  Participants' interests in the loyal and prudent management of their health plan assets far outweighs any legitimate interest that Defendants may assert to continued access to the MEWA and Participating Plans' assets.

## IV.   CONCLUSION

For the reasons set forth above, the Secretary respectfully requests that this Court grant his application for a temporary restraining order, and:

1. Remove, restrain and enjoin Defendants, their officers, agents, servants, employees, successor companies, and all persons in active concert or participation with them, from exercising any authority or control with respect to the management of the MEWA, the Participating Plans, and plan assets;

2. Order a temporary freeze on specific bank accounts where the Participating Plans' assets are believed to exist, in order to preserve these assets from being improperly dissipated;

3. Appoint an independent fiduciary to assume control of the management and

---

however, has taken the additional step of showing that an injunction is necessary to prevent irreparable harm.

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

administration of the MEWA and Participating Plans who has exclusive authority:

    a.  To conduct an accounting of all available assets,

    b.  To create a trust for the exclusive benefit of plan participants,

    c.  To administer and pay claims, pay service providers, and terminate the MEWA,

    d.  Over Defendants' operations with respect to the MEWA and Participating Plans and be provided, by Defendants and their agents and employees, all information necessary to manage and administer the MEWA and Participating Plans;

4. Issue an order pursuant to the All Writs Act staying, enjoining and/or prohibiting any person or entity from claiming as against the assets of the Plans outside of the procedures and processes to be set forth by the independent fiduciary and for such protections to be maintained until closure of the liquidation process or until further order by this Court;

5. Issue an order to show cause why a preliminary injunction should not issue enjoining and restraining Defendants from violating Sections 403, 404, and 406(b) of the ERISA;

6. Require that Defendants immediately send notice to all employers and employee participants notifying them that their plans are underfunded and may not be able to pay past or future benefits so that they may make fully informed decisions regarding their health care;

7. Schedule a hearing on the Secretary's request for a preliminary injunction to be held as soon as is practicable for the Court;

8. Order all such relief that the Court deems appropriate, just, and proper.

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC

1

Dated: February 1, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KATE S. O'SCANNLAIN
Solicitor of Labor

JANET M. HEROLD
Regional Solicitor

IAN H. ELIASOPH
Counsel for ERISA

*/s/ Grace A. Kim*
GRACE A. KIM
Senior Trial Attorney
Attorneys for Plaintiff Secretary of Labor

SECRETARY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF APPLICATION FOR TRO AND OSC