1  JANET M. HEROLD, Regional Solicitor
2  IAN H. ELIASOPH, Counsel for ERISA
   CA State Bar No. 227557
3  GRACE A. KIM, Senior Trial Attorney
4  CA State Bar No. 247456
   Office of the Solicitor
5  United States Department of Labor
6  350 S. Figueroa St., Suite 370
   Los Angeles, California 90071-1202
7  Telephone: (213) 894-3950
8  Facsimile:  (213) 894-2064
9  kim.grace@dol.gov

10 Attorneys for Plaintiff, Secretary,
11 United States Department of Labor

12              UNITED STATES DISTRICT COURT FOR
13              THE CENTRAL DISTRICT OF CALIFORNIA
14
15 R. ALEXANDER ACOSTA,                 ) Case No. 19-cv-778-MWF (MAAx)
     Secretary of Labor,                )
16   United States Department of Labor, ) **DECLARATION OF DINA**
                                        ) **YADEGARIAN IN SUPPORT OF**
17   Plaintiff,                         ) **PLAINTIFF SECRETARY OF**
                                        ) **LABOR'S STATEMENT OF**
18        v.                            ) **POSITION RE NATIONS**
                                        ) **RELIABLE LENDING, LLC'S**
19 RIVERSTONE CAPITAL LLC, a Cali-      ) **OPPOSITION TO INDEPENDENT**
   fornia limited liability corporation; ) **FIDUCIARY'S MOTION TO**
20 NEXGEN INSURANCE SERVICES            ) **APPROVE ITS [PROPOSED]**
   INCORPORATED, a California corpo-    ) **ORDERLY PLAN OF**
21 ration; NGI BROKERAGE               ) **LIQUIDATION AND FOR ORDER**
   SERVICES, INC., a California corpora- ) **PROVIDING ALL WRITS ACT**
22 tion; JAMES C. KELLY, an individual; ) **PROTECTION (DKT. 55)**
   TRAVIS O. BUGLI, an individual;      )
23 ROBERT CLARKE, an individual; and    )
24 ERIK MANQUEROS, an individual.       )
                                        )
25    Defendants.                       )
                                        )
26 ─────────────────────────────────────)
27
28

1   I, DINA YADEGARIAN, declare as follows:

2 1. I am employed by the United States Department of Labor, Employee Benefits Se-

3   curity Administration ("EBSA"), as a Supervisory Investigator.  My office is lo-

4   cated at 35 N. Lake Avenue, Suite 300, Pasadena, California, 91101.  The facts

5   stated here are based on my personal knowledge or my review of the file in this

6   case.  If called as a witness, I could and would competently testify to the follow-

7   ing matters.

8 2. In the course of my duties as Supervisory Investigator, I investigate and/or over-

9   see investigations of employee benefit plans for compliance with Title I of the

10   Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

11   1001-1191c.

12 3. In September 2018, EBSA notified RIVERSTONE CAPITAL LLC, a California

13   limited liability corporation; NEXGEN INSURANCE SERVICES

14   INCORPORATED, a California corporation; NGI BROKERAGE SERVICES,

15   INC., a California corporation (collectively, "Riverstone") that our office was

16   conducting an investigation pursuant to ERISA.

17 4. In furtherance of the investigation into the Riverstone multiple employer welfare

18   arrangement ("MEWA") and underlying ERISA covered participating plans

19   ("Participating Plans"), EBSA issued several subpoenas on the Riverstone entities

20   and third parties.  All documents attached hereto as exhibits were provided to

21   EBSA either in response to a subpoena or provided voluntarily.

22 5. The document attached as **Exhibit 1** is a true and correct copy of an

23   Administrative Services Agreement that EBSA received pursuant to a subpoena.

24 //

25 //

26 //

27 //

28 //

1         Executed on April 15, 2019 in Pasadena, California, I declare under penalty of

2 perjury that the above is true and correct to the best of my knowledge and belief.

3

4

5                             DINA YADEGARIAN

6                             Supervisory Investigator

7                             Employee Benefits Security Administration

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE

I, the undersigned declarant, hereby say:

1. I am over the age of 18 years and am not a party to this litigation.

2. I am employed in the Office of the Solicitor and am an attorney of record herein for the U.S. Department of Labor.

3. On the date indicated below, I caused to be served a true and correct copy of the attached **DECLARATION OF DINA YADEGARIAN IN SUPPORT OF PLAINTIFF SECRETARY OF LABOR'S STATEMENT OF POSITION RE NATIONS RELIABLE LENDING, LLC'S OPPOSITION TO INDEPENDENT FIDUCIARY'S MOTION TO APPROVE ITS [PROPOSED] ORDERLY PLAN OF LIQUIDATION AND FOR ORDER PROVIDING ALL WRITS ACT PROTECTION (DKT. 55)** by depositing in a U.S. Postal Service mail box located in Los Angeles, California, a copy thereof in a sealed, postage-paid envelope addressed to:

Riverstone Capital, LLC
c/o Travis O. Bugli
11311 Queensbury Drive
Bakersfield, CA 93312
buglitravis@gmail.com

NexGen Insurance Services, Inc.
c/o Travis O. Bugli
11311 Queensbury Drive
Bakersfield, CA 93312
buglitravis@gmail.com

NGI Brokerage Services, Inc.
c/o Travis O. Bugli
11311 Queensbury Drive
Bakersfield, CA 93312
buglitravis@gmail.com

James C. Kelly

332 Flower St.
Costa Mesa, CA 92627
James_C_Kelly@yahoo.com

Travis D. Bugli
11311 Queensbury Drive
Bakersfield, CA 93312
buglitravis@gmail.com

Robert Clarke
24159 Twin Tides Drive
Santa Clarita, CA 91355
RMC90292@yahoo.com

4.  This Declaration was duly executed in Los Angeles, California, on the date indicated below.

I have read this Declaration and hereby say, under penalty of perjury, that this Declaration is true and correct.

Dated: April 15, 2019


_/s/ Grace A. Kim_____

Grace A. Kim
Declarant

# Exhibit 1

ADMINISTRATIVE SERVICES AGREEMENT

This Agreement is entered into this first day of August, 2018 ("Effective Date") by and between NATIONS RELIABLE LENDING, LLC (the "Plan Sponsor") and S&S HEALTHCARE STRATEGIES, LTD. ("S&S").

In consideration of the promises and the mutual covenants contained in this Agreement, it is hereby agreed as follows:

SECTION 1
THE PLAN

1.1 The Plan Sponsor has adopted an employee welfare benefit plan (the "Plan") within the meaning of the Employee Retirement Income Security Act ("ERISA") for the benefit of its employees and their dependents (the "Participants") who are eligible to participate in and receive benefits under the Plan as set forth in the Plan Sponsor's Plan documents.

1.2 The Plan Sponsor has requested S&S to provide administrative services for the Plan, and S&S has agreed to provide such administrative services in accordance with the terms of this Agreement, without assuming any liability of the Plan Sponsor under the Plan.

1.3 For the purpose of ERISA and any other legislation of similar nature, the Plan Sponsor shall be deemed the plan administrator and named fiduciary of the Plan within the meaning of ERISA. S&S is an independent contractor performing its obligations under this Agreement, and in no event shall S&S be named the "appropriate named fiduciary" or have any discretionary authority over any Plan assets or in administering the Plan.

1.4 S&S does not assume any responsibility regarding the status of the Plan or Plan benefits under any federal, state, or local statute such as the Internal Revenue Code.

1.5 Plan Sponsor shall provide S&S with a true and complete copy of the Plan. Notification of any changes or modifications to the Plan and the administration of such changes shall be made as provided for in sections 2.3.1 and 5.1.1.

1.6 S&S shall be entitled to rely on any signed written communication received from the Plan Sponsor or Plan Sponsor's agent. S&S shall not be bound by any notice, direction, requisition, or request unless and until it shall have been received in writing.

1.7 The term "Plan" as used in this Agreement shall include any modification or amendment as of the implementation date agreed upon by the parties that have been communicated, in writing, by the Plan Sponsor to S&S. In the event that S&S provides administrative services for more than one of the Plan Sponsor's benefit plans pursuant to this Agreement, the term "Plan" shall refer to all such plans collectively.

1.8 Plan Sponsor will have final authority in establishing the terms and conditions of the Plan.  In addition, Plan Sponsor will have final authority to determine participant and claim eligibility. However, Plan Sponsor acknowledges that any stop loss insurance contract issued to Plan Sponsor may limit coverage to claims, eligible and paid, under the written terms and conditions of the contract.

SECTION 2
ADMINISTRATIVE SERVICES

2.1   It is understood and agreed that the services performed by S&S are administrative in nature only and that no fiduciary discretion is delegated by the Plan Sponsor.

2.2   S&S shall have no obligation to provide any services under this Agreement related to a claim or other event regarding healthcare delivered before the Effective Date of this Agreement. S&S will include in its standard fees the administration of up to a 30 calendar- day backlog of claims from the prior administrator (i.e., claims with dates of service no earlier than 30 calendar days before the Effective Date of the Agreement ("run-in claims")) but only in accord with the benefits currently being administered for the Plan by S&S and contingent upon the prior administrator providing S&S the necessary information to process the run-in claims. The Plan Sponsor will be responsible for claims that exceed this volume.

2.3   S&S will provide the following services for the basic administrative charges as set forth in the fee agreement between Plan Sponsor and the Plan's program manager, Riverstone Capital, LLC (hereinafter "Riverstone"), unless otherwise specified herein:

2.3.1   Plan Design.  S&S will consult with the Plan Sponsor in connection with the design and development of the Plan. At the direction of the Plan Sponsor, S&S will design, develop, and prepare the Plan documents, including a summary plan description (SPD), summary of benefits and coverage (SBC), and other materials relating to the Plan, in accordance with S&S' standard forms for those documents. However, the Plan Sponsor bears the cost of printing and distributing these documents. As referenced in 6.3, substantial deviation from S&S' standard documents may result in an additional charge to the Plan Sponsor. Within thirty (30) days after delivery of Plan documents or amendments prepared by S&S, Plan Sponsor will notify S&S in writing of its acceptance of such documents.

S&S shall perform the administrative services described in this Agreement in accordance with the Plan documents and amendments that have been adopted by Plan Sponsor.

S&S will prepare any reasonably necessary revisions or amendments to the Plan document and the Plan Sponsor shall bear the cost of printing and distributing any such revisions or amendments. If the number of requests by the Plan Sponsor for such revisions or amendments becomes excessive, then S&S retains the right to charge an hourly rate for time expended in making such additional revisions or amendments. In addition, if Plan Sponsor adopts an amendment with a retroactive effective date, S&S reserves the right to charge a fee to cover its costs incurred to adjust claims processed prior to the amendment.

2.3.2   Member Service.  S&S shall respond to written or telephone requests for information made during normal business hours from Plan Sponsor, Plan Participants, and providers of service regarding Plan benefits. S&S will also provide a toll free inquiry line in order to respond promptly and reasonably to all requests and questions submitted by Participants and providers of health care services.

2.3.3   Enrollment.  S&S will maintain the benefit-account structure and Plan Participants' eligibility information for the Plan. In determining any claimant's right to benefits under the Plan, S&S shall rely on eligibility information furnished electronically or in writing by

the Plan Sponsor. It is mutually understood that the effective performance of this Agreement by S&S will require that it be advised on a timely basis by the Plan Sponsor during the continuance of this Agreement of the identity of individuals eligible for benefits under the Plan.

If Plan Sponsor requires S&S to load inbound eligibility data into the S&S claims systems, S&S will launch an audit comparison report prior to loading incoming eligibility files. The purpose of the comparison audit is to assure that erroneous data does not override existing valid data. Data that appears suspect will not be loaded into the system. The comparison report identifying the potential errors will be forwarded to Plan Sponsor. The Plan Sponsor will be responsible for investigating such data and for correcting the host system in a timely manner. Once the data in the host system has been corrected, the inbound eligibility files will be imported into the S&S claims systems.

Plan Sponsor acknowledges that claims associated with such erroneous enrollment records may result in a delay in the adjudication process for such Plan participant's claims.

S&S will give Plan Sponsor's authorized employees the ability to enter eligibility information regarding Plan participants in S&S' eligibility system ("System").

S&S will train Plan Sponsor's employees on the use of the System. S&S will also provide technical support to Plan Sponsor during normal business hours. Technical support will consist of answering questions about or providing assistance with loading and maintaining eligibility data.

Information entered or modified by employees of Plan Sponsor in the system is the responsibility of Plan Sponsor; S&S will not be liable for any costs incurred as a result of any errors by Plan Sponsor's employees in inputting or altering information in the system. S&S may charge Plan Sponsor to adjust claims under these circumstances; the fee will be determined and presented to Plan Sponsor before S&S undertakes any requested adjustments.

2.3.4   <u>Claims Administration</u>.  S&S will receive and review all properly submitted claims for benefits and will use its best efforts to compute the benefit payable in accordance with the Plan. In determining any person's right to benefits under the Plan, S&S shall rely on eligibility information as furnished by Plan Sponsor. The claims processing services to be performed by S&S are further explained under Section 3 of this Agreement.

2.3.5   <u>Records and Files</u>.  S&S will maintain, in a form deemed appropriate by S&S and while this Agreement is in force, claim files and such other records as are necessary to perform services under this Agreement for at least seven years following the year in which the services are performed or any applicable period required by law, whichever is longer. S&S will comply with applicable laws and regulations regarding confidentiality of medical records and other Plan records. All the Plan's records and files belong to the Plan Sponsor.

2.3.6   <u>Reports.</u> S&S shall provide Plan Sponsor with standard sets of self-funded reports, as they currently exist or may be revised from time to time. S&S will provide the Plan Sponsor with information in S&S' possession necessary for the Plan Sponsor to comply with any laws or regulations applicable to the Plan, including ERISA, but Plan

Sponsor's compliance with any such laws or regulations shall be the sole responsibility of the Plan Sponsor.

2.4   <u>Additional Services</u>.   The Plan Sponsor may request that S&S provide assistance in coordinating installation of products or programs with other entities for the purpose of providing services to the Plan Sponsor. S&S will provide other services, if any, as set forth in Section 12 of this Agreement, under the terms provided in sections 6.6 and 6.7 of this Agreement.

2.5   <u>Processing of State Surcharges</u>. Various states have adopted or will adopt a surcharge and/or annual assessment charge when healthcare participants receive medical care in their state.  S&S is currently providing services related to such surcharges and assessments for the New York Health Care Reform Act (HCRA); Massachusetts Health Safety Net surcharge and annual assessment program; and Michigan Health Insurance Claims Assessment.

If Plan Sponsor elects or is required by law to (1) comply with the filing and payment requirements of a particular state's surcharge/assessment  programs, and (2) requests S&S to administer the processing and payment of such surcharges/assessments on its behalf, S&S will provide the services for a fee mutually agreed upon by the parties.

With respect to services for all such surcharges, S&S has no responsibility for any payments due or any other costs, expenses, or liabilities of any kind associated with these services. Plan Sponsor is responsible for all assessments from the various states and for providing funds for any amounts due under any state surcharge program or similar tax, however denominated, including any penalties assessed for failure to make payments in a timely manner or for any other reason.

SECTION 3
<u>CLAIMS ADMINISTRATION</u>

3.1   S&S shall process all claim payments and denials, and any reviews thereof, in accordance with the Plan and all applicable statutory and regulatory requirements. In determining any person's right to benefits under the Plan, S&S shall rely on information furnished in writing by the Plan Sponsor or the Plan Sponsor's agent. S&S is not responsible or liable for acts or omissions made in reliance on erroneous data provided by Plan Sponsor or the failure of Plan Sponsor to perform its obligations under this Agreement.

3.1.1   If S&S determines that a claim is not payable, in whole or in part, under the terms of the Plan, S&S shall provide adequate notice in writing to any person whose claim for benefits under the Plan has been denied, setting forth the reasons for the denial and the person's right to a full and fair review of the denial under ERISA.

3.1.2   All contested claims will be subject to the appeal procedures set forth in the Plan.  S&S shall consult with and assist the Plan Sponsor in reviewing the denial and any written comments submitted by the Participant or authorized representative regarding the denial.

3.2   The Plan Sponsor hereby authorizes S&S to obtain professional reviews, independent medical evaluations, and audits of hospital or other health care provider costs and expenses in order to determine whether hospital and physician charges are accurate, appropriate, and necessary. The Plan Sponsor shall be responsible for all reasonable fees or expenses, if any, of third parties in connection with such audits. S&S assumes no liability or responsibility for the acts or omissions of any third party retained pursuant to this section 3.2.

3.3     S&S will use its best efforts to correctly process claims and pay benefits in accordance with the Plan and information provided by the Plan Sponsor. S&S will be responsible for reasonable efforts for recovery of any loss resulting therefrom, but will not be required to initiate legal process for any such recovery.

      3.3.1   Plan Sponsor authorizes S&S to use reasonable efforts to pursue, negotiate, and settle subrogation, coordination of benefits, or overpaid claims arising under the Plan, including the employment of third party legal counsel or retention of a third party recovery contractor to prosecute such claims. In the event that S&S employs third party legal counsel or third party recovery contractor on behalf of the Plan and/or Plan Sponsor, said legal counsel or recovery contractor shall represent the Plan and/or Plan Sponsor. All decisions pertaining to Plan interpretation, claim settlement, and legal process shall be made by a fiduciary of the Plan Sponsor with the advice of the third party legal counsel or recovery contractor, and S&S shall not be deemed a fiduciary. The Plan Sponsor acknowledges that such third party contractor or legal counsel may receive compensation for such services based on a percentage of recoveries. S&S assumes no liability or responsibility for the acts or omissions of any third party retained pursuant to this section 3.3.1, and the Plan Sponsor will be responsible for all reasonable fees and expenses, if any, incurred pursuant to the employment of such third parties.

      3.3.2   Where recovery efforts are not successful, such loss may be treated as a benefit expense.

      3.3.3   Plan Sponsor shall cooperate with any subrogation efforts as described under this Section 3.3. In the event that Plan Sponsor wishes to independently pursue such subrogation rights either initially or at any time during the term of this Agreement, Plan Sponsor shall notify S&S in writing of its intent to pursue such recoveries on its own or through a third party of its choice.

3.4     S&S will attempt to negotiate settlement with healthcare providers of claims submitted to the Plan (hereinafter referred to as "Claims"). Claim negotiation services will be applied only to Claims from non-network providers or to Claims of plans using Referenced Based Pricing to determine allowable charges.

      S&S will contact the providers to propose a settlement of the providers' Claim(s). For each such Claim, S&S, acting as the agent of Plan Sponsor, will enter into a Provider Claim Settlement Agreement and Release ("Claim Release") with the provider for settlement of the Claim in return for payment to be made by Plan Sponsor within fifteen (15) days after the Claim Release is fully executed. S&S shall provide the Plan's program manager, Riverstone Capital, LLC, with executed copies of Claim Releases.

      The Plan's program manager will bill the Plan Sponsor the fees listed below for services provided to Plan Sponsor each week and Plan Sponsor shall remit payment to the Plan's program manager within 5 business days of receipt of the invoice.

      Plan Sponsor shall pay providers the amounts the providers have agreed to accept in accordance with the provisions of the Claim Releases.

      Plan Sponsor shall pay S&S the following amounts, as applicable:

- 15% of Savings for Claims from group health plans NOT using advanced funding or Referenced Based Pricing,
- Case-by-case determination of the fee, but not to exceed 25% of Savings, for Claims from group health plans using advanced funding for payment of the negotiated Claim,
- 11% of billed charges or 22% of Savings for Claims from group health plans using Referenced Based Pricing.

Savings is defined as the difference between a provider's gross billed charges for the healthcare services as reflected in the Claim and the reduced amount the provider agreed to accept in full settlement of the Claim.

## SECTION 4
## BANKING ARRANGEMENTS

4.1    Funds used to pay Plan benefits shall be provided by the Plan Sponsor.

4.2    S&S shall establish and maintain a benefit plan account ("S&S Client Account") with a financial institution to be selected by S&S. The Plan Sponsor shall provide sufficient amounts to the Plan's program manager, Riverstone Capital, LLC, to fund the medical claims component per invoice. S&S shall disburse benefit payments to providers of health care services from the S&S Client Account. The Plan Sponsor is also responsible for all banking charges for monthly maintenance, processing of voids, stop payments, insufficient funds, or any such similar charges.

Funds in the Account shall remain the property of the Plan Sponsor, except as required under applicable law.

If funds have not been provided for the payment of approved claims, S&S reserves the right to notify claimants and providers of services that the account has not been funded by the Plan Sponsor.

## SECTION 5
## DUTIES AND RESPONSIBILITIES OF PLAN SPONSOR

5.1    Plan Sponsor understands that the effective performance by S&S of the administrative services under this Agreement will require that the Plan Sponsor provide to S&S in a timely manner and in a written format acceptable to S&S, any information required for the proper administration of the Plan.  Such information may include:

5.1.1    A true and complete copy of the summary plan description and any applicable Plan amendments. The Plan Sponsor may amend or modify the Plan at its discretion. Such properly executed Plan amendments or authorized modifications shall be submitted to S&S in writing at least sixty (60) days prior to the proposed effective date.  As provided for in Section 6.2, if such Plan amendments or modifications increase or change the nature of the administrative services or duties provided by S&S under the terms of this Agreement, S&S has the right to not provide such additional services or amend this Agreement and renegotiate the fees associated with the provision of such services.

5.1.2    Identification or certification of individuals eligible for benefits, the kind of benefits to which such individuals are entitled, date of eligibility, and such other information as may be necessary for processing of benefit payments.

5.1.3   Submission of claim history information from prior carrier.

5.2     Plan Sponsor will provide and distribute to all eligible Plan Participants, either directly or, as mutually agreed upon, with the assistance of S&S, such appropriate and necessary Plan documents and materials, including summary plan descriptions, summaries of benefits and coverage, Plan amendments, identification cards, enrollment forms, and applications and notice forms, as may be necessary for the operation of the Plan or to satisfy the requirements of applicable law and ERISA regulations.

5.3     The Plan Sponsor shall handle all enrollment of the Participants in the Plan and respond to all routine inquiries from employees concerning enrollment in and the terms and conditions of the Plan.

5.4     The Plan Sponsor shall provide S&S with a complete list of all Participants in the Plan as of the effective date of this Agreement, and shall notify S&S in a timely manner of all additions, terminations, changes in classification, and other new information regarding the Plan Sponsor's employees' and their dependents' effective participation in the Plan. The Plan Sponsor acknowledges that its prompt and complete furnishing of the required eligibility information is essential to the timely and efficient administration by S&S of claims for Plan benefits. If Plan Sponsor does not notify S&S of a participant's termination of coverage within three months of the date of non-eligibility for coverage, S&S shall not be obligated to refund administrative charges paid by Plan Sponsor for said participant beyond the three months after the participant became ineligible for coverage.

5.5     Plan Sponsor shall have the additional following duties:

5.5.1   Collect any contribution from employees which is required for participation in the Plan. Failure to collect any such contribution will not relieve Plan Sponsor from any of its obligations under this Agreement.

5.5.2   Be responsible for compliance with the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). Plan Sponsor will provide notice to S&S of each Plan Participant's effective date of COBRA continuation and the date such COBRA continuation ceases. S&S will be entitled to rely upon the information provided by the Plan Sponsor pertaining to COBRA eligibility.  Plan Sponsor will be liable for any and all claims resulting from the failure of Plan Sponsor to administer COBRA in accordance with this Agreement and applicable laws and regulations.

5.5.3   Notify all employees of changes in the Plan.

5.5.4   Comply with any laws or regulations applicable to the Plan, including ERISA, and satisfy any and all reporting, notice, disclosure, and filing requirements imposed by applicable laws and regulations.

5.5.5   Provide all other services required to operate the Plan, which are not identified as the responsibility of S&S under this Agreement.

## SECTION 6
## COMPENSATION FOR ADMINISTRATIVE SERVICES

6.1     The Plan Sponsor agrees to pay S&S, via Riverstone, for the services to be performed hereunder, the fees set forth in the monthly statement provided to Plan Sponsor by Riverstone as described in section 6.4 herein. The monthly administrative fee is per Plan Subscriber ("Subscriber"). A Plan Subscriber includes each eligible employee, retiree, or COBRA continuee.

6.2     The initial administrative fees under this Agreement shall be effective for at least twelve (12) months from the effective date of this Agreement. Thereafter, S&S may revise those fees at any time upon at least thirty (30) days' advance written notice to the Plan Sponsor, provided that any such revised fees shall be effective for at least twelve (12) months. It is understood that the fees quoted are based on the number of subscribers and the services to be provided to those subscribers. Therefore, notwithstanding the advance notice requirement herein, if the number of Plan Subscribers substantially changes or if there is any change or increase in the nature of the services provided by S&S under this Agreement as a result of amendments or modifications in the Plan(s), S&S shall have the right to revise the fees, and such revised fees shall become effective on the effective date of such modification or amendment. In the event the parties cannot agree on a new fee within 30 days of the date S&S received written notice of the amendment and modification, S&S shall have no obligation to provide the increased or changed services and may terminate this Agreement upon 30 days' prior written notice to the Plan Sponsor.

6.3     In the event the Plan Sponsor requests non-standard or customized services, the additional cost of such services shall be paid by Plan Sponsor at S&S' then-current rates plus out-of-pocket expenses.

6.4     Riverstone, on behalf of S&S, will provide Plan Sponsor with a monthly statement identifying the fees and premiums payable by Plan Sponsor. Fees are due on the first of each month. All per Subscriber fees shall be based on S&S' record of enrollment as of the billing period. Appropriate adjustments will be made for enrollment variances on the next monthly statement.

6.5     Plan Sponsor acknowledges that if payments are not received by S&S within thirty (30) days of the due date, S&S may immediately cease providing administrative services; and Plan Sponsor understands that the stop loss carrier may cancel coverage. If administrative services are reinstated, the Plan Sponsor shall pay S&S an additional fee of one month's average monthly administration fee for each month or portion thereof that administrative services were ceased.

        S&S may, in its sole discretion, terminate this Agreement in the event the Plan Sponsor fails to pay its administrative fees and/or any other monies due S&S and unpaid 30 days after written notification.

6.6     As mutually agreed between the parties, S&S may coordinate installation of products or programs with other entities for the purpose of providing services to the Plan Sponsor. Therefore, Plan Sponsor acknowledges that fees may include charges for services and products provided by third parties on behalf of Plan Sponsor that are the responsibility of the Plan Sponsor.

6.7     Additional services may be provided by S&S, which will be charged to and be payable by Plan Sponsor.

6.7.1   Design, printing, and distribution of benefits checks or drafts, explanation of benefit forms, and claim forms, as appropriate, will be provided by S&S and are included in the normal monthly service fee. If the Plan Sponsor requests design and coordination of printing of any other forms and/or customization of standard forms, such additional out-of-pocket costs will be the responsibility of the Plan Sponsor.

6.7.2   The Plan Sponsor is entitled to standard reports. Additional special or customized reports may be requested by Plan Sponsor and, based upon report requirements, S&S retains the right to charge an additional fee for such special or customized reports.

6.7.3   Any expenses for medical records ordered for claim processing are the responsibility of the Plan Sponsor, as are any other claim expenses.

6.7.4   Any expenses for audit of hospital, medical, or other bills submitted for consideration under the Plan(s) for which S&S provides administrative services are the responsibility of Plan Sponsor, as are any other claim expenses.

6.7.5   Special or customized identification cards may be requested by the Plan Sponsor, and all costs related to the special or custom cards, including but not limited to stock or grade of card, printing, design, and postage are the responsibility of the Plan Sponsor.

SECTION 7
LIABILITY AND INDEMNITY

7.1   It is understood that the Plan Sponsor retains all final authority and responsibility for the Plan and its operation, and that S&S is empowered to act on behalf of the Plan Sponsor in connection with the Plan only as expressly stated in this Agreement or as mutually agreed to in writing by both parties.

7.2   In performing its obligations under this Agreement, S&S neither insures nor underwrites any liability of the Plan Sponsor under the Plan, and S&S is not the provider of benefits under the Plan and is not responsible or liable for the funding of claims or the payment of fees to third parties providing services or products to Plan Sponsor. S&S shall be responsible only to perform, as an independent contractor, the services described in this Agreement.

7.3   Except as provided in paragraph 7.5 below, S&S shall have no duty or obligation to defend against any legal action or proceeding brought to recover a claim for Plan benefits. S&S shall, however, make available to the Plan Sponsor and its counsel, such evidence relevant to such action or proceeding as S&S may have as a result of its administration of the contested benefit determination.

7.4   The Plan Sponsor agrees during and after the term of this Agreement to indemnify S&S for and hold it, its directors, officers, and employees, harmless from all amounts and expenses (including reasonable attorney's fees and court costs) incurred by S&S:

7.4.1   For any state premium, or similar tax, however denominated, including any penalties and interest payable with respect thereto;

7.4.2   In consequence of any acts or omissions of the Plan Sponsor occurring during the operation of this Agreement alleged to be a breach of duty under ERISA;  or

7.4.3   Arising from any legal action or proceeding to recover benefits under the Plan (except any claim or proceeding from which S&S is responsible under the provisions of paragraph 7.5.).

7.5   S&S shall use ordinary and reasonable care in the performance of its duties under this Agreement. S&S agrees during and after the term of this Agreement to indemnify the Plan Sponsor and hold it, its director, officers, and employees, harmless from all amounts and expenses (including reasonable attorney's fees and court costs) for which the Plan Sponsor may become liable or which the Plan Sponsor may incur in consequence of any fraudulent or criminal act or omission of S&S, its officers or employees in connection with its duties under this Agreement, but S&S shall not be liable to the Plan Sponsor for any mistake or judgment or other actions taken in good faith that do not result from any fraudulent or criminal act or omission.  S&S maintains a fidelity bond in the amount required by state and federal law.

SECTION 8
TERM AND TERMINATION

8.1   Term.  This initial Agreement shall be effective as of the date indicated above and shall continue in force for a period of twelve (12) months (the initial contract term). This Agreement shall automatically renew for successive one-year periods, unless either party gives the other written notice of termination at least 30 days prior to the anniversary date.

8.2   Early Termination.  If Plan Sponsor terminates this Agreement other than in accordance with Section 8.1, Plan Sponsor shall be obligated to pay the monthly administrative fees to S&S through the end of the initial contract term, unless Plan Sponsor terminates this Agreement with cause as specified in this section. This payment is charged to compensate S&S for loss from start-up costs incurred and not covered by the set-up fee.

8.3   Renewal.  Either party shall have the right to renegotiate the agreement on each anniversary date by giving to the other party written notice of such renegotiation of the terms of the contract at least thirty days in advance of the anniversary date.

8.4   Termination.  This Agreement may be terminated on the earliest to occur of any of the following:

8.4.1   Upon 30 days' written notice, this Agreement may be terminated by either party on the anniversary date or any other date if mutually agreed to by the parties.

8.4.2   If either party gives notice of its intent to renegotiate, as provided for in 8.3, but the parties have not agreed in writing prior to the anniversary date, this Agreement shall terminate as of the anniversary date, unless otherwise agreed.

8.4.3   If renegotiated fees as a result of any change or increase in the nature of services provided by S&S under this Agreement are not mutually agreed upon in writing, as provided for in section 6.2, the Agreement may be terminated at the option of S&S, upon 30 days' prior written notice, and S&S shall have no obligation to provide the changed or increased services during the notice period.

8.4.4   This agreement shall immediately terminate without the necessity of notice if either party becomes insolvent or shall be adjudicated as bankrupt, or if either party's business shall come into the possession or control, even temporarily, of any trustee

in bankruptcy, or if a receiver shall be appointed for it or if either party makes a general assignment for creditors.

8.4.5    S&S reserves the right to terminate this Agreement on the date specified in a written notice to the Plan Sponsor for the Plan Sponsor's failure, or persistent delay, in providing adequate funds to pay approved claims upon request as provided for in the Plan.

8.4.6    S&S reserves the right to terminate this Agreement on the date specified in a written notice to the Plan Sponsor if the Plan Sponsor fails to remit the administrative charges to S&S within thirty (30) days of the date due.

8.4.7    Other than a failure to pay as described in Section 8.4.5. and 8.4.6, either party may terminate this Agreement in the event of a material default by the other party. Such termination shall be effective 30 days after written notice specifying the default has been given to the defaulting party, if the default has not been cured by the end of the notice period.

8.4.8    S&S may terminate this Agreement, effective immediately, upon written notice to the Plan Sponsor in the event the Plan Sponsor is in substantial non-compliance with ERISA or other applicable laws and rules.

8.4.9    Plan Sponsor may terminate this Agreement, effective immediately, upon written notice in the event S&S fails to obtain or maintain any required licenses or regulatory approvals necessary for it to perform services under this Agreement.

8.4.10   If any state or other jurisdiction enacts a law which prohibits the continuance of this Agreement or existing law is interpreted to so prohibit the continuance of this Agreement, the Agreement shall terminate automatically as to such time and as to such jurisdiction on the effective date of such law or interpretation.

8.5    <u>Obligations Upon Termination</u>.    Termination of this Agreement by either party will not terminate the Plan Sponsor's obligation to pay or fund any amounts for which Plan Sponsor is or becomes liable pursuant to the provisions of the Plan or this Agreement. All checks issued by S&S which are outstanding upon termination of the Agreement will continue to be the responsibility and liability of the Plan Sponsor.

8.5.1    Once written notice has been given by either party indicating an intent to terminate this Agreement, S&S shall be responsible only to administer claims filed with and received by S&S prior to the effective date of such notice.

8.5.2    Administration of all claims arising subsequent to the date of termination shall be the responsibility of the Plan Sponsor. S&S shall have no liability or obligation to process any further claims, subsequent to termination of this Agreement, unless agreed to by it in writing. By written agreement, "run-out claims," for a period specified and for a fee mutually agreed upon may be processed by S&S after notice. The terms and conditions of this Agreement will govern any such "run out" processing except as otherwise agreed.

8.5.3    In the event of termination of this Agreement, S&S shall provide reasonable cooperation to the Plan Sponsor or entity selected by Plan Sponsor to assume administration of the Plan. Within 30 days of termination of services under this

Agreement and upon request, S&S will provide to Plan Sponsor or designee claims data, current eligibility data, and other standard reports provided to the Plan Sponsor under this Agreement. With the exception of S&S' confidential and proprietary data relevant to its claims services, S&S will, upon written request and at the expense of the Plan Sponsor, provide other information regarding the Plan, to the extent reasonably available to S&S, within a time frame mutually agreeable. If the claim history is requested, the Plan Sponsor will pay all reasonable costs incurred in providing the history, including the cost of programming, computer charges, mailing costs, etc. This information will be provided in the standard S&S format.

8.6    <u>Late Termination Notice.</u>  If Plan Sponsor fails to provide notice of termination as required in this section 8 of the Agreement, Plan Sponsor may be liable for fees to third party vendors and/or S&S for costs incurred due to the late notice, may lose rebates from pharmacy benefit managers, or may be subject to other expenses.

SECTION 9
<u>CONFIDENTIALITY</u>

9.1    All information disclosed to S&S in connection with this Agreement and the Agreement itself shall, unless otherwise agreed in writing, be deemed to be confidential and proprietary and will be used by S&S only to carry out and perform the terms of this Agreement or for general statistical purposes. S&S agrees to treat all information concerning the Plan Sponsor's business operations, Participant's claims, the Plan, and the Account in a confidential manner. This Section 9.1, however, does not preclude S&S from disclosing to potential clients the fact that S&S is administering claims for the Plan Sponsor.

9.2    The Plan Sponsor agrees to treat all information concerning S&S' business operations, price quotes, ideas, trade secrets, and other proprietary data in a confidential manner. The Plan Sponsor further acknowledges that all records, reports, and other data provided by S&S under this Agreement are solely for the Plan Sponsor's use in benefit administration and Plan management. The Plan Sponsor shall treat as confidential any information that individually identifies a patient, Plan Participant, or provider of services.

9.3    Neither party shall disclose any such confidential information to any other person without the prior written consent of the party to whom the information pertains. Nothing in this Section shall prohibit the disclosure of any information required by law, but in the event of any such disclosure, the disclosing party shall immediately notify the other party in writing detailing the circumstances and extent of the disclosure.

SECTION 10
<u>RIGHT TO AUDIT</u>

10.1    S&S and Plan Sponsor shall allow each other to audit, review, and duplicate such records and any other records in their possession which relate primarily to the obligations of either party under the terms of this Agreement. Upon reasonable notice, the review and duplication of records shall be allowed during regular business hours at the place of business maintaining the records and shall be subject to all applicable state and federal laws and regulations regarding the confidentiality of such records. Any and all costs of such investigation or audit will be paid by the party requesting the audit, including duplication costs of any records. The initial price quote includes and contemplates one audit per year of S&S by Plan Sponsor and S&S may, at its option, charge fees for participating in additional audits.

10.1.1   Reasonable notice will be considered to be at least 20 work days' advance written notice of the intent to audit. No third party may be allowed or designated to conduct an audit or inspection without the prior written consent of the party whose records are being audited.

10.1.2   The start and completion of the audit process should be confined to a prearranged time frame.

10.1.3   During the course of the audit, reasonable steps should be taken to minimize interference with the operations of the party being audited. For this reason, one individual will be designated by the audited party as spokesperson to act as intermediary between the auditor(s) and office personnel. The auditor(s) will be restricted to interviewing only individuals designated by such spokesperson.

10.1.4   If requested, the credentials of the auditors should be made available.

10.1.5   Any and all costs of such investigation or audit will be paid by the party requesting the audit.

10.1.6   No documents are to be removed from the office being audited. Duplication shall be at the cost of the requesting party.

10.2   If the Plan Sponsor is investigated or audited by any state or federal agency, S&S will fully cooperate with such agency's reasonable and lawful request for information.

## SECTION 11
### MISCELLANEOUS

11.1   The Agreement and any exhibits hereto constitute the entire Agreement between the parties. This Agreement may be amended at any time by mutual written consent of the parties, provided that an amendment may not reduce any benefits payable or otherwise prejudice a claim arising prior to the amendment.

11.2   This Agreement supersedes any and all agreements, including any and all amendments thereto, whether written or oral, previously entered into between S&S and Plan Sponsor.  The terms of this Agreement will prevail in the event of a conflict between this Agreement and any other document that describes either S&S' services for the Plan or the relationship between Plan Sponsor and S&S (such as but not limited to the Plan Document and Summary Plan Description).

11.3   This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.4   Any written notices required or permitted to be given in this Agreement by either party to the other shall be sent by personal delivery or by certified or registered mail or first class mail postage prepaid to the address as listed below, or other address as properly communicated. Notices delivered personally, certified or registered will be deemed communicated as of the time of actual receipt; notices mailed first class postage prepaid will be deemed communicated as of three business days after mailing.

11.5    The failure of either party to perform its obligations under this Agreement due to occurrences or contingencies beyond the reasonable control of such party, such as fire, flood, strike, and delays by subcontractors, will not constitute a default or breach of this Agreement.

11.6    The failure of either party to enforce or insist upon compliance with any provision of this Agreement in any instance shall not be construed as or constitute a waiver of the right to enforce or insist upon compliance with such provision, either currently or in the future.

11.7    This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Ohio and any applicable provisions of federal law.

11.8    If any provision of this Agreement, or the application of any provision to any person or circumstance, shall be determined to be invalid or unenforceable, such determination shall not affect any other provision of this Agreement.

11.9    This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective parties and assigns.

11.10   Plan Sponsor shall not hire or contract for the services of any employee of S&S during the term of this Agreement and for one year thereafter.

11.11   In the event a dispute concerning this Agreement cannot be satisfactorily resolved, the dispute will be settled by arbitration in Cincinnati, Ohio, in accordance with the rules and regulations of the American Arbitration Association then in effect. All disputes shall be decided by one (1) arbitrator.  Arbitration and attorney's fees shall be borne by each party as incurred by it, regardless of the outcome of the arbitration. No arbitration award may provide attorneys' fees and costs as part of said award.

11.12   The subject headings of the articles and paragraphs of this Agreement are included for purposes of convenience and shall not affect the construction or interpretation of any of its provisions.

SECTION 12
OTHER APPLICABLE AGREEMENTS

12.1    The following exhibits are attached to and are a part of this Agreement:

Exhibit A                   Preferred Provider Network Services
Exhibit B                   HIPAA Business Associate Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers duly authorized to do so.

NATIONS RELIABLE LENDING, LLC          S&S HEALTHCARE STRATEGIES, LTD.
2506 W. Main St., Suite 400            1385 Kemper Meadow Drive
Houston, TX 77098                      Cincinnati, Ohio 45240

BY:  *Merary Hercules*                 BY:  _____

PRINT NAME:  Merary Hercules           PRINT NAME:  Howard Buff

TITLE:  HR & Payroll Manager           TITLE:  Chief Executive Officer

DATE:  9/19/2018                       DATE:  _____

EXHIBIT A
PREFERRED PROVIDER NETWORK SERVICES

This Preferred Provider Network Services Agreement ("PPN" Agreement) supplements and is incorporated into the Administrative Service Agreement between Nations Reliable Lending, LLC ("Plan Sponsor") and S&S Healthcare Strategies, Ltd. (S&S).

WHEREAS, Plan Sponsor wishes to secure access to hospital and outpatient healthcare providers through a preferred provider network known as Cigna ("PPN") effective the first day of August, 2018.

WHEREAS, PPN has developed a panel of providers comprised of hospitals, physicians and other health care providers for the purpose of coordinating and arranging for the delivery of health care services to Plan Participants;

WHEREAS, S&S will provide assistance in coordinating installation of programs with PPN for the purpose of providing services to the Plan Sponsor;

NOW THEREFORE, Plan Sponsor agrees to make payment for services in accordance with this PPN Agreement and any agreement required by the PPN and agrees to all of the terms and conditions of this PPN Agreement which apply to Plan Sponsor.

SECTION 1
PPN SERVICES

1.1     PPN is responsible for recruiting and contracting with PPN participating providers.  All communications with PPN participating providers concerning the negotiation, execution or ongoing management and maintenance of such contracts will be conducted by or through PPN.

1.2     PPN will provide Plan Sponsor access to the PPN participating providers and their negotiated fee reimbursements.

1.3     PPN will make a directory of Network Providers available on PPN's website.  PPN shall also provide a toll free telephone number for use by Participants in determining whether a provider participates in the PPN.

1.4     In order for S&S to compensate PPN participating providers for services rendered to Plan Participants according to PPN executed agreements with participating providers, PPN may provide S&S with a data base of PPN participating providers, pertinent billing information, and applicable reimbursement schedules for downloading into S&S' claims system, which will be updated as needed.

1.5     If PPN does not provide S&S with participating provider information necessary to appropriately pay Plan Sponsor's Plan benefits, PPN will reprice participating provider claims and deliver repriced claims to S&S for processing on behalf of Plan Sponsor. Claims will be considered received by S&S when delivered to S&S.

SECTION 2
PLAN SPONSOR'S RESPONSIBILITIES

2.1    Plan Sponsor understands that S&S, via Riverstone, will invoice Plan Sponsor for a
       monthly fee.  Plan Sponsor shall make payment to S&S under the terms and conditions
       as set forth in Section 6 of that Administrative Service Agreement. Upon receipt of such
       administrative fees, Plan Sponsor authorizes S&S to disburse funds to health care
       vendors on Plan Sponsor's behalf.

2.2    Plan Sponsor warrants that it assumes financial liability for the payment of participating
       provider claims and PPN's fees during the term of this Agreement.  Plan Sponsor further
       agrees that in the event that S&S' agreement with PPN is terminated for any reason or
       in the event that S&S' Administrative Service Agreement with Plan Sponsor is
       terminated for any reason, Plan Sponsor shall remain directly liable to PPN participating
       providers for payments pursuant to the terms of PPN's agreement with S&S for covered
       services furnished to Plan Participants prior to such termination.

2.3    Plan Sponsor will include financial incentives in its Plan to encourage Plan Participants
       to use PPN participating providers for health care services covered by Plan.

2.4    Plan Sponsor shall be responsible and liable for claim decisions and for any payments
       or denials of payment of any claims submitted by any participating provider for
       furnishing Covered Services or non-Covered Services to Plan Participants. Plan
       Sponsor acknowledges that neither PPN nor S&S will be liable for payment of provider
       claims or for any decision made under the Plan. Further, Plan Sponsor agrees to
       indemnify and hold PPN and S&S and their respective officers, agents and employees
       harmless from any and all liability, loss, damage, claim or expense of any kind, including
       cost and attorney's fees which result from negligent or willful acts or omission by Plan
       Sponsor or its agents, officers or employees, in connection with the duties and
       obligations of Plan Sponsor under this PPN Agreement.

2.5    Plan Sponsor agrees to have adequate available funds to pay approved claims upon
       request. In the event Plan Sponsor fails to deposit sufficient funds in its payment
       account to reimburse PPN participating providers within the time required to maintain
       the discounted rates negotiated by PPN, Plan Sponsor will not be entitled to such PPN
       discounts.  Plan Sponsor also acknowledges and agrees that Plan Sponsor will not be
       entitled to PPN discounts if the failure to pay claims in the required time is due solely to
       Plan Sponsor's failure to provide S&S with information in Plan Sponsor's sole
       possession or control that is needed to process claims,

2.6    Plan Sponsor agrees that compensation terms are confidential and Plan Sponsor shall
       not release such terms to any person or entity for purposes other than the
       administration of the Plan without receiving prior consent from PPN.

2.7    If required by the PPN, Plan Sponsor will execute an agreement with the PPN.

2.8    Plan Sponsor acknowledges that PPN may, in its sole discretion, add or delete
       providers from the PPN Network and may modify any provider contract.

2.9     Plan Sponsor acknowledges that PPN is a third party beneficiary of this PPN Agreement and may enforce the obligations of Plan Sponsor under this Agreement.

2.10    If Plan Sponsor fails to maintain a benefit differential as required under Section 2.3 or fails to fund claims as required by Section 2.5, fails to pay PPN's fees, fails to provide required information, improperly uses PPN contracted provider reimbursement rates, or fails to perform any of its responsibilities under this PPN Agreement or any Joinder Agreement, PPN may terminate the right of Plan Sponsor to the benefit of contracted rates from PPN participating providers, or may terminate the right to access the PPN Network.

2.11    Plan Sponsor acknowledges that upon termination of this PPN Agreement, PPN and S&S will terminate all services under this PPN Agreement.  The termination of this PPN Agreement or the Administrative Service Agreement does not affect Plan Sponsor's obligation to pay for all services performed through the date of termination.

2.12    Plan Sponsor agrees that in no event will PPN have any liability to Plan Sponsor or any Plan Participant in connection with, nor will PPN have any responsibility for the acts or omissions of any medical provider who provides any services to a Participant under this PPN Agreement.

SECTION 3
S&S' RESPONSIBILITIES

3.1     In order to determine the amount due a PPN participating provider, S&S shall process claims in the amounts set forth in the applicable PPN reimbursement schedule as payment for any claims submitted for covered services furnished to Plan Participants pursuant to the terms of the Plan.

3.2     S&S shall notify Plan Sponsor of funds necessary to reimburse approved claims.  As provided for under Section 2.5, Plan Sponsor is responsible for depositing adequate funds into its payment account for the purpose of reimbursing approved claims.  If after 30 days of such funding request, funds have not been provided by Plan Sponsor for the payment of claims, S&S reserves the right to notify claimants and providers of services that the account has not been funded by the Plan Sponsor.

3.3     For the fee identified in the monthly statement supplied by Riverstone, S&S will provide Plan Participants with an identification card that will indicate that the individual is enrolled in the PPN. This card shall include a telephone number where information may be obtained regarding verification of eligibility.

3.4     S&S will provide Plan Sponsor with a monthly statement identifying the fees and premiums payable by Plan Sponsor.  The Plan Sponsor shall make payment to S&S on or before the first day of the month payment is due. Upon receipt of such payment, S&S will reimburse PPN for its administrative services. S&S agrees to notify PPN in the event S&S is unable to make timely payment of PPN fees due to nonpayment by Plan Sponsor.

SECTION 4
<u>GENERAL PROVISIONS</u>

4.1    Each party agrees that materials and information supplied by one party to the other in performing this Agreement shall be kept confidential, unless specifically authorized otherwise in writing, and may not be distributed except for appropriate insurance and utilization management activities related to the performance of this PPN Agreement.

4.2    Plan Sponsor, PPN and S&S shall use ordinary care and reasonable diligence in the exercise of their respective powers and performance of their duties hereunder.  Liability, if any, for damages hereunder shall not extend to any indirect, special, incidental, consequential, exemplary or punitive damages, however caused.

4.3    Each party shall indemnify and hold harmless the other party and their respective officers, agents and employees from and against any and all liability, loss, damage, claim or expense of any kind, including attorney's fees, which may be sustained, suffered, recovered or made against the indemnified party by any third party and which arise out of any action or inaction of the indemnifying party with respect to its duties and obligations under this PPN Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Preferred Provider Network Agreement to be executed by their respective officers duly authorized to do so.

NATIONS RELIABLE LENDING, LLC      S&S HEALTHCARE STRATEGIES, LTD.
2506 W. Main St., Suite 400            1385 Kemper Meadow Drive
Houston, TX 77098                  Cincinnati, Ohio 45240

BY: _____     BY: _____

PRINT NAME: _____    PRINT NAME:  Howard Buff

TITLE: _____     TITLE:  Chief Executive Officer

DATE: _____     DATE: _____

EXHIBIT B
BUSINESS ASSOCIATE ADDENDUM

## I.  PREAMBLE

This Business Associate Addendum is entered into this first day of August, 2018 (the "Effective Date") by and between Nations Reliable Lending, LLC ("Plan Sponsor") and S&S HealthCare Strategies, Ltd.

Plan Sponsor ("Covered Entity") and S&S HealthCare Strategies, Ltd. ("Business Associate") (jointly "the Parties") wish to modify the Administrative Services Agreement ("Agreement") to incorporate the terms of this Addendum to comply with the requirements of: (i) the implementing regulations at 45 C.F.R. Parts 160, 162, and 164 for the Administrative Simplification provisions of Title II, Subtitle F of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (i.e., the HIPAA Privacy, Security, Electronic Transaction, Breach Notification, and Enforcement Rules ("the Implementing Regulations")),   (ii) the requirements of the Health Information Technology for Economic and Clinical Health Act, as incorporated in the American Recovery and Reinvestment Act of 2009 (the "HITECH Act") that are applicable to business associates, and (iii) the requirements of the final modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules as issued on January 25, 2013 and effective March 26, 2013 (75 Fed. Reg. 5566 (Jan. 25, 2013)) ("the Final Regulations").   The Implementing Regulations, the HITECH Act, and the Final Regulations are collectively referred to in this Addendum as "the HIPAA Requirements."

Covered Entity and Business Associate agree to incorporate into this Addendum any regulations issued by the U.S. Department of Health and Human Services ("DHHS") with respect to the HIPAA Requirements that relate to the obligations of business associates and that are required to be (or should be) reflected in a business associate agreement.  Business Associate recognizes and agrees that it is obligated by law to meet the applicable provisions of the HIPAA Requirements and that it has direct liability for any violations of the HIPAA Requirements.

The Parties agree as follows.

## II.  DEFINITIONS

(a) All terms used in this Addendum shall have the meanings set forth in the applicable definitions under the HIPAA Requirements.

## III. GENERAL TERMS

(a)  In the event of an inconsistency between the provisions of this Addendum and a mandatory term of the HIPAA Requirements (as these terms may be expressly amended from time to time by DHHS, a court, or another regulatory agency with authority over the Parties), the interpretation of DHHS, such court or regulatory agency shall prevail.  In the event of a conflict among the interpretations of these entities, the conflict shall be resolved in accordance with rules of precedence.

(b)  Where provisions of this Addendum are different from those mandated by the HIPAA Requirements, but are nonetheless permitted by the HIPAA Requirements, the provisions of this Addendum shall control.

(c) Except as expressly provided in the HIPAA Requirements or this Addendum, this Addendum does not create any rights in third parties.

## IV.  SPECIFIC REQUIREMENTS

(a) <u>Flow-Down of Obligations to Business Associate Subcontractors.</u>  Business Associate agrees that as required by the HIPAA Requirements, Business Associate will enter into a written agreement with all Business Associate Subcontractors that: (i) requires them to comply with the Privacy and Security Rule provisions of this Addendum in the same manner as required of Business Associate, and (ii) notifies such Business Associate Subcontractors that they will incur liability under the HIPAA Requirements for non-compliance with such provisions.   Accordingly, Business Associate shall ensure that all Business Associate Subcontractors agree in writing to the same privacy and security restrictions, conditions and requirements that apply to Business Associate with respect to PHI.

(b) <u>Privacy of Protected Health Information</u>

(i)   *Business Associate Obligations*.  Business Associate agrees to create, receive, use, disclose, maintain, or transmit PHI only in a manner that is consistent with this Addendum or the HIPAA Requirements and only in connection with providing the services to Covered Entity identified in the Agreement.  Business Associate further agrees that to the extent it is carrying out one or more of the Covered Entity's obligations under the Privacy Rule (Subpart E of 45 C.F.R. Part 164), it shall comply with the requirements of the Privacy Rule that apply to the Covered Entity in the performance of such obligations.

(1)   Business Associate shall report to Covered Entity any use or disclosure of PHI that is not provided for in this Addendum, including reporting Breaches of Unsecured Protected Health Information as required by 45 C.F.R. § 164.410 and required by Section IV(e)(ii) below.

(2)   Business Associate shall establish, implement, and maintain appropriate safeguards, and comply with the Security Standards (Subpart C of 45 C.F.R. Part 164) with respect to Electronic PHI, as necessary to prevent any use or disclosure of PHI other than as provided for by this Addendum.

(ii)  *Permitted Uses and Disclosures of PHI.*  As permitted by the HIPAA Requirements, Business Associate may use or disclose PHI received by the Business Associate in its capacity as a Business Associate to the Covered Entity for Business Associate's own operations if:

(1)   the <u>use</u> relates to: (1) the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate, or (2) data aggregation services relating to the health care operations of the Covered Entity; or

(2)   the <u>disclosure</u> of information received in such capacity will be made in connection with a function, responsibility, or services to be performed by the Business Associate, and such disclosure is required by law or the Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will be held confidential and the person agrees to notify the Business Associate of any breaches of confidentiality.

(iii) *Minimum Necessary Standard and Creation of Limited Data Set.*  Business Associate's use, disclosure, or request of PHI shall utilize a Limited Data Set if practicable.  Otherwise, in performing the functions and activities as specified in the services agreement between the Parties and this Addendum, Business Associate agrees to use, disclose, or request only the minimum necessary PHI to accomplish the intended purpose of the use, disclosure, or request.

(iv) *Access.*  In accordance with 45 CFR § 164.524 of the HIPAA Requirements, Business Associate will make available to the Covered Entity (or as directed by the Covered Entity, to those individuals who are the subjects of the PHI (or their designees)), their PHI in the Designated Record Set.   Business Associate shall make such information available in an electronic format where directed by the Covered Entity.

(v) *Disclosure Accounting.*  Business Associate shall make available the information necessary to provide an accounting of disclosures of PHI as provided for in 45 C.F.R. § 164.528 of the HIPAA Requirements, by making such information available directly to the Covered Entity or (at the direction of the Covered Entity) making such information available directly to the individual.

(vi) *Amendment.*  Business Associate shall make PHI in a Designated Record Set available for amendment and, as directed by the Covered Entity, incorporate any amendment to PHI in accordance with 45 C.F.R. § 164.526 of the HIPAA Requirements.

(vii) *Right to Request Restrictions on the Disclosure of PHI and Confidential Communications.*  If an individual submits a Request for Restriction or Request for Confidential Communications to the Business Associate, Business Associate and Covered Entity agree that Business Associate, on behalf of Covered Entity, will evaluate and respond to these requests according to Business Associate's own procedures for requests.

(viii) *Return or Destruction of PHI.*  Upon the termination or expiration of the Agreement or this Addendum, Business Associate agrees to return the PHI to Covered Entity, destroy the PHI (and retain no copies), or if Business Associate determines that return or destruction of the PHI is not feasible, (a) continue to extend the protections of this Addendum and of the HIPAA Requirements to the PHI, and (b) limit any further uses and disclosures of the PHI to the purpose making return or destruction infeasible.

(ix) *Availability of Books and Records.*  Business Associate shall make available to DHHS or its agents the Business Associate's internal practices, books, and records relating to the use and disclosure of PHI in connection with this Addendum.

(c) <u>Information and Security Standards</u>

(i) Business Associate will develop, document, implement, maintain, and use appropriate Administrative, Technical, and Physical Safeguards to preserve the Integrity, Confidentiality, and Availability of, and to prevent non-permitted use or disclosure of, Electronic PHI created or received for or from the Covered Entity.

(ii)  Business Associate agrees that with respect to Electronic PHI, these Safeguards, at a minimum, shall meet the requirements of the HIPAA Security Standards applicable to Business Associate.

(iii)  More specifically, to comply with the HIPAA Security Standards for Electronic PHI, Business Associate agrees that it shall:

   (1)  Report to Covered Entity, any unauthorized access, use, disclosure, modification, or destruction of PHI (including Electronic PHI) not permitted by this Addendum, applicable law, or permitted by the Covered Entity in writing ("Successful Security Incidents" or Breaches) of which Business Associate becomes aware.  Business Associate shall report such Successful Security Incidents or Breaches to Covered Entity as specified in section IV(e)(iii)(1);

   (2)  For Security Incidents that do not result in unauthorized access, use, disclosure, modification, or destruction of PHI (including, for purposes of example and not for purposes of limitation, pings on Business Associate's firewall, port scans, attempts to log onto a system or enter a database with an invalid password or username, denial-of-service attacks that do not result in the system being taken off-line, or malware such as worms or viruses) (hereinafter "Unsuccessful Security Incidents"), aggregate the data and, upon the Covered Entity's written request, report to the Covered Entity in accordance with the reporting requirements identified in section IV(e)(iii)(2);

   (3)  Take all commercially reasonable steps to mitigate, to the extent practicable, any harmful effect that is known to Business Associate resulting from any unauthorized access, use, disclosure, modification, or destruction of PHI;

   (4)  Permit termination of this Addendum if the Covered Entity determines that Business Associate has violated a material term of this Addendum with respect to Business Associate's security obligations and Business Associate is unable to cure the violation; and

   (5)  Upon Covered Entity's request, provide Covered Entity with access to and copies of documentation regarding Business Associate's safeguards for PHI and Electronic PHI.

(d)  Compliance with HIPAA Transaction Standards

(i)  *Application of HIPAA Transaction Standards*.  Business Associate will conduct Standard Transactions consistent with 45 C.F.R. Part 162 for or on behalf of the Covered Entity to the extent such Standard Transactions are required in the course of Business Associate's performing services under the Agreement and this Addendum for the Covered Entity.  As provided for in section IV(a) above, Business Associate will require any Business Associate Subcontractor involved with the conduct of such Standard Transactions to comply with each applicable requirement of 45 C.F.R. part 162.  Further, Business Associate will not enter into, or permit its Subcontractors to enter into, any trading partner agreement in connection with the conduct of Standard Transactions for or on behalf of the Covered Entity that:

   (1)  Changes the definition, data condition, or use of a data element or segment in a Standard Transaction;

   (2)  Adds any data element or segment to the maximum defined data set;

(3)     Uses any code or data element that is marked "not used" in the Standard Transaction's implementation specification or is not in the Standard Transaction's implementation specification; or

(4)     Changes the meaning or intent of the Standard Transaction's implementation specification.

(ii)     *Specific Communications*.  Business Associate, Plan Sponsor and Covered Entity recognize and agree that communications between the parties that are required to meet the Standards for Electronic Transactions will meet the Standards set by that regulation.  Communications between Plan Sponsor and Business Associate, or between Plan Sponsor and the Covered Entity, do not need to comply with the HIPAA Standards for Electronic Transactions.  Accordingly, unless agreed otherwise by the Parties in writing, all communications (if any) for purposes of "Enrollment" as that term is defined in 45 C.F.R. Part 162, Subpart O, or for "Health Covered Entity Premium Payment Data" as that term is defined in 45 C.F.R. Part 162, Subpart Q, shall be conducted between the Plan Sponsor and either Business Associate or the Covered Entity.  For all such communications (and any other communications between Plan Sponsor and the Business Associate), Plan Sponsor shall use such forms, tape formats, or electronic formats as Business Associate may approve.  Plan Sponsor will include all information reasonably required by Business Associate to affect such data exchanges or notifications.

(iii)     *Communications Between the Business Associate and Covered Entity*.     All communications between the Business Associate and the Covered Entity that are required to meet the HIPAA Standards for Electronic Transactions shall do so.  For any other communications between the Business Associate and the Covered Entity, the Covered Entity shall use such forms, tape formats, or electronic formats as Business Associate may approve.  The Covered Entity will include all information reasonably required by Business Associate to affect such data exchanges or notifications.

(e)     <u>Notice and Reporting Obligations of Business Associate</u>.

(i)     *Notice of Non-Compliance with the Addendum*.  Business Associate will notify Covered Entity within thirty (30) calendar days after discovery of any unauthorized access, use, disclosure, modification, or destruction of PHI (including any successful Security Incident) that is not permitted by this Addendum, by applicable law, or permitted in writing by Covered Entity, whether such non-compliance is by (or at) Business Associate or by (or at) a Business Associate Subcontractor.

(ii)     *Notice of Breach*.  Business Associate will notify Covered Entity following discovery and without unreasonable delay but in no event later than thirty (30) calendar days following discovery, of any Breach of Unsecured Protected Health Information whether such Breach is by Business Associate or by Business Associate Subcontractor.

(1)     As provided for in 45 C.F.R. § 164.402, Business Associate recognizes and agrees that any acquisition, access, use or disclosure of PHI in a manner not permitted under the HIPAA Privacy Rule (Subpart E of 45 C.F.R. Part 164) is presumed to be a Breach.  As such, Business Associate shall (i) notify Covered Entity of any non-permitted acquisition, access, use, or disclosure of PHI, and (ii) assist Covered Entity in performing (or at Covered Entity's direction, perform) a risk assessment to determine if there is a low probability that the PHI has been compromised.

(2)    Business Associate shall cooperate with Covered Entity in meeting the Covered Entity's obligations under the HIPAA Requirements and any other security breach notification laws.  Business Associate shall follow its notification to the Covered Entity with a report that meets the requirements outlined immediately below.

(iii)    *Reporting Obligations*.

(1)    For Successful Security Incidents and Breaches, Business Associate - without unreasonable delay and in no event later than thirty (30) calendar days after Business Associate learns of such non-permitted use or disclosure (whether at Business Associate or at Business Associate Subcontractor) - shall provide Covered Entity a report that will:

a.    Identify (if known) each individual whose Unsecured Protected Health Information has been, or is reasonably believed by the Business Associate to have been accessed, acquired, or disclosed;

b.    Identify the nature of the non-permitted access, use, or disclosure including the date of the incident and the date of the discovery;

c.    Identify the PHI accessed, used, disclosed (e.g., name, social security number, date of birth);

d.    Identify what corrective action Business Associate (or Business Associate Subcontractor) took or will take to prevent further non-permitted accesses, uses, or disclosures;

e    Identify what Business Associate (or Business Associate Subcontractor) did or will do to mitigate any deleterious effect of the non-permitted access, use, or disclosure; and

f    Provide such other information, including a written report, as the Covered Entity may reasonably request.

(2)    For Unsuccessful Security Incidents, Business Associate shall provide Covered Entity, upon its written request, a report that: (i) identifies the categories of Unsuccessful Security Incidents as described in Section IV(c)(iii)(4); (ii) indicates whether Business Associate believes its (or its Business Associate Subcontractor's) current defensive security measures are adequate to address all Unsuccessful Security Incidents, given the scope and nature of such attempts; and (iii) if the security measures are not adequate, the measures Business Associate (or Business Associate Subcontractor) will implement to address the security inadequacies.

(iv)    *Continuing Privacy and Security Obligations*.   Business Associate's and the Covered Entity's obligation to protect the privacy and security of the PHI it created, received, maintained, or transmitted in connection with services to be provided under the Agreement and this Addendum will be continuous and survive termination, cancellation, expiration, or other conclusion of the Agreement or this Addendum.   Business Associate's other obligations and rights, and the Covered Entity's obligations and rights upon termination, cancellation, expiration, or other conclusion of this Addendum, are those set forth in this Addendum and/or the Agreement.

## V.  OBLIGATIONS OF COVERED ENTITY

(a)    Covered Entity shall provide Business Associate with documentation identifying the plan sponsor personnel with whom Business Associate may share PHI.

(b)    Covered Entity shall provide Business Associate with any changes in, or revocation of, permission by an individual to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures.

(c)    Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that the Covered Entity has agreed to in accordance with 45 CFR 164.522 and Business Associate agrees to conform to any such restriction.

## VI.  TERM AND TERMINATION

(a)    <u>Term</u>.  The Term of this Addendum shall be effective as of the Effective Date, and, except as provided in section VI (b) below, shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information in accordance with the termination provisions in this section VI.

(b)    <u>Termination.</u>  Covered Entity and Business Associate each will have the right to immediately terminate this Agreement by providing written notice of termination if the other Party has engaged in a pattern of activity or practice that constitutes a material breach or violation of the other Party's obligations regarding PHI under this Agreement and, on notice of such material breach or violation from the non-breaching Party, fails to cure the material breach or end the violation within 30 calendar days after receipt of notice of the material breach or violation.

(c)    <u>Effect of Termination</u>.

(1)    Except as provided in paragraph (2) of this section VI(c), upon termination of this Addendum, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity.  This provision shall apply to PHI that is in the possession of Subcontractors or agents of Business Associate.  Business Associate shall retain no copies of the PHI.

(2)    In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall extend the protections of this Addendum to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

The parties hereto have caused this Addendum to be executed by their respective officers duly authorized to do so.

NATIONS RELIABLE LENDING, LLC          S&S HEALTHCARE STRATEGIES, LTD.
2506 W. Main St., Suite 400            1385 Kemper Meadow Drive
Houston, TX 77098                      Cincinnati, Ohio 45240


BY: _____          BY: _____


PRINT NAME: _____          PRINT NAME:  Howard Buff


TITLE: _____          TITLE:  Chief Executive Officer


DATE: _____          DATE: _____